Ronnie FINCH

v.

STATE of Tennessee.

Supreme Court of Tennessee, at Nashville.

Feb. 1, 2007 Session.

June 4, 2007.

James P. McNamara, Nashville, Tennessee, for appellant/appellee, Ronnie Finch.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Mark A. Fulks, Assistant Attorney General; Bret T. Gunn, Assistant District Attorney General, for the appellee/appellant, the State of Tennessee.

## OPINION

CORNELIA A. CLARK, J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., and JANICE M. HOLDER and GARY R. WADE, JJ., joined.

The Petitioner, Ronnie Finch, was convicted of one count of facilitation of first degree premeditated murder and two counts of facilitation of attempted first degree premeditated murder. In this post-conviction proceeding, the Petitioner contends that his lawyer provided ineffective assistance at trial. We granted this appeal to determine whether counsel was ineffective in failing to object when the trial court erroneously took his motion for judgment of acquittal under advisement and in continuing to participate in the trial thereafter. Because we hold that defense counsel's representation did not prejudice the Petitioner, we reverse the Court of Criminal Appeals and reinstate the judgments of conviction against the Petitioner.

## FACTS

This case arises out of a gunfight in May 1998 that left Ben White dead and Leo White injured. The proof adduced during the State's case-in-chief established that the Petitioner and Jerome Jones argued in front of Jones' residence in the Settle Court Apartments in Nashville, Tennessee. Jones lived in a downstairs apartment toward one end of a two-story building.

Although the Petitioner did not threaten Jones during the argument, Jones spent the rest of the day in his apartment in order to avoid "trouble." Jones testified that when he looked out of his window later that day, he saw the Petitioner "running down the sidewalk with a gun in his hand." Sharon Sanders, who shared Jones' apartment, also saw the Petitioner with a handgun at their building that day.

The next day, the Petitioner came to Jones' apartment accompanied by codefendants Frank Huey and Jeffrey Gills. Jones took the Petitioner and Huey into his bedroom where they could talk privately, as Sanders and numerous children were also in the apartment. Gills remained in the living room. Once in the bedroom, the men accused Jones of having threatened to kill the Petitioner. Huey pulled out a .38 pistol and hit Jones on the head with the gun, causing Jones to bleed. According to Jones, the Petitioner made no attempt to stop Huey. Huey then held the gun to Jones' head and walked him out of the bedroom toward the front door of the apartment. Sanders heard Huey say that he was going to take Jones outside and shoot him. In the living room, Huey encountered Jones' cousin, Michael White, who had just entered the apartment. Huey pointed the gun at White and indicated that the altercation was not his business. Huey then left the apartment through the front door and fired a single shot into the air. The Petitioner and Gills left the apartment through the back door.

Sherry Stevens, Jones' aunt, lived across the street from Jones. She saw Huey leave Jones' apartment and fire a gun into the air. Stevens heard Huey say, "that will teach them to mess with my family."

Following this incident, Jones left his apartment and stayed gone for several hours. He returned during the evening with Harold Blair. Jones was under the impression that Blair was going to provide him a gun for protection. Word of the altercation had spread, and more trouble was feared. Jones' two uncles, Ben White and Leo White, also came over to visit. Leo backed his sedan into a parking space in front of Jones' apartment. Jones testified that Leo had a gun in the trunk of the car that he intended to give Jones for Jones' protection.

According to Jones, his uncles were standing near the trunk of Leo's car, Blair was on the porch in front of Jones' apartment, and Jones was walking away from his uncles and toward the porch when gunfire erupted. Jones testified that the shots were being fired from three locations: from just outside the far front corner of the building in which his apartment was located, from a location between that corner and the near side of the street, and from a location in the street closer to its far side. According to a diagram of the area about which Jones testified, these three spots were in a diagonal line stretching away from the corner of the building to the far side of the street fronting the building. Standing on Jones' porch and looking straight ahead toward the street, this area was to the right of Jones' apartment.

With the eruption of gunfire, Jones ran up on the porch in front of his apartment and joined Blair. The two men then ran up the stairs in the breezeway that ran alongside Jones' apartment. Blair fired a pistol several times toward the area in back of the building. Jones testified that he thought Blair's gun was a .45. Jones did not see anyone else with a gun. Jones testified that he was unarmed and that neither Ben nor Leo was armed when the shooting began.

Leo White testified that he and Ben and Jones were standing around Leo's car while Leo was preparing to open his trunk and show Ben a handgun. As Jones began walking off and as Leo opened the trunk, gunfire erupted. Leo explained that he was facing his trunk and the shots were coming from his right. Leo turned to his left and ran to hide between his car and the car next to it. Ben was right behind him. Leo testified that he heard five shots, with the last one hitting him in the back of his leg. He ducked beside his car,

"on the opposite side of the car from where the shots were coming from." His brother was lying down at the back of the car, shot. Once the shots started, Jones "went towards his apartment." Leo stated that, once he was shot, he did not hear anything else. Ben was shot twice and died from his gunshot wounds.

Sherry Stevens also witnessed the beginning of the gunfight. As she was preparing to cross the street toward Jones' apartment, she looked to her left and saw Gills in the street walking toward the building in which Jones' apartment was located. She also saw the Petitioner and Huey coming around the far corner of that building toward the street. Gills, Huey, and the Petitioner congregated in the same general vicinity. As Stevens crossed the street, she saw Gills point a handgun toward Leo and Ben and begin to shoot. She ran and sought cover in Jones' apartment.

Other witnesses also saw portions of the gunfight. Sanders was on the porch of Jones' apartment when the shooting began. She saw Gills standing in the street and pointing a gun at Jones' apartment. Christopher Works saw Huey at the side of the building with a rifle. According to Works, that is the location from which the shooting began. Works' mother, Janice Goff, also saw Huey at the side of the building. Goff saw Huey shooting the gun, which she described as longer than a pistol and appearing "sawed-off." Goff also saw a man in the middle of the street with a gun the size of a pistol.

Officer Matt Pilcus of the Metro Police Department was the first officer on the scene. He was less than two blocks away when the gunfight began. Officer Pilcus testified, "It sounded like the 4th of July when you take a whole pack of firecrackers and you light up the whole pack. I mean, it was just round after round after round,

simultaneous." When he arrived, he got out of his patrol car and heard one of the victims moaning. As he tended to the Whites, an unidentified black male claiming to be a family member came over and became disruptive. Officer Pilcus did not describe any other persons attempting to render aid until medical personnel arrived. Officer Pilcus saw no weapons near the victims.

The police recovered numerous shell-casings and projectiles from the scene. Nine nine-millimeter shell casings were found in the area of the porch in front of Jones' apartment. One .45 caliber shell casing was found in this same area; three other .45 caliber shell casings were found behind Jones' apartment. One .38 caliber bullet was found in the breezeway behind the porch. In the area extending from the far front corner of the building into the street, where the three defendants were observed, fourteen nine-millimeter shell casings fired from two different weapons and three 7.62 × 39 caliber shell casings were found. The police also obtained a bullet recovered during Ben White's emergency-room treatment.

Steve Scott, from the Tennessee Bureau of Investigation crime laboratory, testified . that thirteen of the fourteen nine-millimeter shell casings found in the area where the defendants had been seen were fired from a single nine-millimeter gun. One of the nine-millimeter shell casings found in this area was fired from a different nine-millimeter weapon. The three 7.62 × 39 caliber shell casings also found in the area where the defendants had been seen were fired from at least one additional gun, one

or more rifles.[1] Scott testified that 7.62 × 39 caliber shells are the typical ammunition fired from Chinese SKS-type or Russian AK47 rifles. Scott identified the bullet recovered during Ben White's emergency treatment as "a 7.62 by 39 caliber fired bullet." Each of the nine-millimeter shell casings recovered from the porch area of Jones' apartment were fired from a third nine-millimeter gun. The four .45 caliber shell casings recovered from the porch area and behind Jones' apartment were all fired from yet another gun.

The Petitioner, Huey, and Gills were indicted jointly for one count of first degree premeditated murder, two counts of attempted first degree premeditated murder, two counts of aggravated assault with a deadly weapon, and one count of felony endangerment. The three men were tried together by a jury. The jury convicted the Petitioner of lesser-included offenses: one count of facilitation of first degree premeditated murder, two counts of facilitation of attempted first degree premeditated murder, and two counts of facilitation of aggravated assault.[2] The trial court merged the facilitation of aggravated assault convictions with the two convictions of facilitation of attempted first degree murder. The jury acquitted the Petitioner of felony reckless endangerment.

## POST–TRIAL HISTORY

### Direct Appeal

The Petitioner appealed his convictions. One of his grounds for appeal was the trial court's handling of his motion for judg-

---

1. Scott testified that these three cartridge cases had insufficient individual markings to determine if all three were shot from a single gun.

2. The jury convicted Huey and Gills of one count of facilitation of first degree murder,

two counts of facilitation of attempted first degree murder, two counts of aggravated assault (which the trial court merged into the facilitation of attempted murder convictions), and one count of reckless endangerment with a weapon.

ment of acquittal made after the close of the State's case-in-chief. At the time the motion was made, the trial court expressed some concern about the sufficiency of the State's proof and then took the motion under advisement. Significantly, defense counsel did not object to the trial court's failure to rule on the motion.[3] Rather, defense counsel continued to participate in the trial by cross-examining a witnesses called by a codefendant.

On direct appeal, the Court of Criminal Appeals agreed with the Petitioner's contention that the trial court had erred by taking his motion for judgment of acquittal under advisement. The intermediate appellate court relied on this Court's decision in *Mathis v. State*, 590 S.W.2d 449 (Tenn. 1979), which states that "[t]here is no authority in our practice or procedure in a criminal case for the trial judge to take under advisement a motion for a judgment of acquittal made at the *conclusion of all the State's proof.*" *Id.* at 453. Rather, if the State fails to adduce sufficient proof during its case-in-chief to support a conviction, the trial court has no alternative upon a defendant's motion for judgment of acquittal but to direct a verdict in the defendant's favor. *Id.*

Regardless of the trial court's error, however, the Court of Criminal Appeals denied relief because *Mathis* holds that

[w]hen the court overrules, or does not act, upon a motion for an acquittal made at the conclusion of the State's proof, if counsel is convinced as to the validity of the motion, he or she must then and there take affirmative action to confine the controversy to the proof already presented. He or she should announce that the defendant stands on his motion, will present no proof, disclaims any benefit of any evidence introduced by his [co-]defendant, disavows any detriment, and should state that the evidence presented by the co-defendant will not be binding upon him, and he should participate no further in the trial until after the conclusion of all the proof.

*Id.* Because the Petitioner's counsel did not object to the trial court's action or stand on his motion but participated in the remainder of the trial by cross-examining a witness called by one of his codefendants, the Court of Criminal Appeals concluded that the Petitioner's actions waived the trial court's error. The intermediate appellate court opined:

The strict guidelines as set forth by our supreme court for preserving as error a trial court's denial of or inaction upon a motion for judgment of acquittal leave no room for a plain error analysis.

---

3. Tennessee Rule of Criminal Procedure 29 governs motions for judgment of acquittal. At the time of the Petitioner's trial, it provided, in pertinent part, as follows:

(a) Motion Before Submission to Jury.— Motions for directed verdict are abolished and motions for judgment of acquittal shall be used in their place. The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses. If a defendant's motion for judgment of acquittal at the

close of the evidence offered by the state is not granted, the defendant may offer evidence without having reserved the right. (b) Reservation of Decision on Motion.—If a motion for judgment of acquittal is made at the close of *all* the evidence, the court may reserve decision on the motion, submit the case to the jury and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict.

Tenn. R.Crim. P. 29 (2000) (emphasis added). The Rule makes no provision for a trial court to take under advisement such motions made at the close of the State's case-in-chief.

Accordingly, *Mathis* requires us to find that the [Petitioner] has waived the trial court's error in taking his motion for judgment of acquittal under advisement. *State v. Huey,* No. M2000–02793–CCA–R3–CD, 2002 WL 517132, at *14–15 (Tenn. Crim.App. Apr.5, 2002).

In his direct appeal, the Petitioner also challenged the sufficiency of the evidence. The Court of Criminal Appeals determined that the proof was sufficient to support the Petitioner's convictions. In assessing the sufficiency of the proof in support of the Petitioner's convictions, the Court of Criminal Appeals relied in part on proof adduced *after* the close of the State's case-in-chief.[4]

### Post–Conviction

After his convictions were affirmed on direct appeal, the Petitioner filed for post-conviction relief alleging ineffective assistance of counsel. The Petitioner claimed that his trial lawyer's performance was deficient because his lawyer was unfamiliar with the *Mathis* decision, did not follow its procedural mandates, and thereby waived the Petitioner's right to challenge on direct appeal the trial court's refusal to grant his motion for judgment of acquittal. The Petitioner also claimed that his lawyer's deficient performance prejudiced him because had the Petitioner been able to raise on direct appeal the issue of the motion for judgment of acquittal, the Petitioner would have prevailed, resulting in reversal of his convictions and dismissal of the charges on the basis of insufficient evidence.

During the post-conviction hearing, which was conducted by the same judge who tried the original case, defense counsel admitted that he was unaware of this Court's decision in *Mathis.* Defense counsel also testified that had he been aware of *Mathis,* he "would have stood on [the motion for judgment of acquittal], objected [to the trial court's taking the motion under advisement], and not participated further in the trial." Defense counsel stated that his failure to object to the trial court's taking the motion under advisement "was not a tactical decision."

Following the hearing, the post-conviction court denied relief. The court found that it had made a mistake at trial when it took the motion for judgment of acquittal under advisement. The court further found, however, that "it had not intended to grant such motion; instead, it would have denied [the Petitioner's] request." The post-conviction court accordingly found that the Petitioner "was not prejudiced by the fact trial counsel did not object to the court's decision nor was he prejudiced by the fact counsel continued to participate in the proceedings."

On appeal, the Court of Criminal Appeals initially concluded that the Petitioner *had* been prejudiced by counsel's handling of the trial court's response to the motion for judgment of acquittal. The intermediate appellate court reasoned that had defense counsel stood on his motion, the court would have been bound to review the sufficiency of the evidence as of the close of the State's case-in-chief. The Court of Criminal Appeals thereupon undertook a review of the proof as of that point in the trial. The intermediate appellate court then concluded that the trial court *should* have granted the motion.[5] Under the

---

**4.** Codefendant Gills called Michelle Taylor who testified that she saw "four guys come running around the corner to the front of the building, and they were shooting at two guys that was between the two cars." On cross-

examination by the State, Taylor identified the Petitioner as one of the four shooters.

**5.** It may have been significant to the Court of Criminal Appeals' conclusion about the suffi-

court's analysis, were it not for counsel's actions at trial, the issue would not have been waived on direct appeal and the Court of Criminal Appeals would have been able to reverse the Petitioner's convictions at that point in the proceedings.

The Court of Criminal Appeals thus concluded that trial counsel was ineffective because his actions with respect to the motion for judgment of acquittal prevented the Court of Criminal Appeals from granting the Petitioner relief on direct appeal. The intermediate appellate court reversed the trial court's denial of post-conviction relief, vacated the Petitioner's convictions, and entered a judgment of acquittal.

The State filed a petition to rehear. In response, the majority of the Court of Criminal Appeals panel persisted in its conclusion that the Petitioner was entitled to relief. However, the court modified its holding, reversing the post-conviction court's judgment and vacating the Petitioner's convictions. In doing so, the majority of the panel acknowledged that "there is no procedure outlined in the post-conviction rules to grant a motion for judgment of acquittal." One judge determined on reconsideration that the proof at the close of the State's case-in-chief had been sufficient to support the Petitioner's convictions and, for that reason, dissented from the majority's conclusion that the Petitioner was entitled to post-conviction relief.

The State now appeals the grant of post-conviction relief. The Petitioner appeals from the remedy finally granted by the intermediate appellate court, arguing that

a judgment of acquittal should be entered and the charges against him should be dismissed.

## STANDARD OF REVIEW

 This Court is bound by a post-conviction court's findings of fact unless the preponderance of the evidence is otherwise. *Vaughn v. State*, 202 S.W.3d 106, 115 (Tenn.2006). However, our review of legal issues or mixed questions of law and fact such as a claim of ineffective assistance of counsel is de novo with no presumption of correctness. *Id.*

## ANALYSIS

### I. Ineffective Assistance of Counsel

 In order to prevail on his claim of ineffective assistance of counsel, the Petitioner must establish both that his lawyer's performance was deficient and that the deficient performance prejudiced the defense. *Id.* at 116 (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn.1975)). To prove deficient performance, the Petitioner must demonstrate that his lawyer's conduct fell below an objective standard of "reasonableness under prevailing professional norms." *Id.* (quoting *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052). As we have stated previously,

> the assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It

---

ciency of the State's proof that it misidentified the Petitioner's convictions as including "two counts of attempted first degree murder and two counts of aggravated assault." As set forth above, the Petitioner was convicted of two counts of facilitation of attempted first degree murder and two counts of facilitation of aggravated assault (the latter two convic-

tions being merged into the former). The proof necessary to establish the facilitation of an attempted offense is significantly less than that required to establish an attempted offense. *Compare* Tenn.Code Ann. § 39–11–403 (2006) (criminal responsibility for facilitation of a felony) *with* § 39–12–101 (2006) (criminal attempt).

is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence.... Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.

*Baxter,* 523 S.W.2d at 934–35 (quoting *Beasley v. United States,* 491 F.2d 687, 696 (6th Cir.1974)). Upon our review of counsel's performance, "we must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State,* 185 S.W.3d 319, 326 (Tenn.2006) (citing *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052).

■■ To prove that counsel's deficient performance prejudiced the defense, the Petitioner "must establish a reasonable probability that but for counsel's errors the result of the proceeding would have been different." *Vaughn,* 202 S.W.3d at 116 (citing *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052). "A 'reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052). That is, the Petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome. *State v. Burns,* 6 S.W.3d 453, 463 (Tenn.1999).

■■ The Petitioner is not entitled to post-conviction relief if he fails to demonstrate either deficient performance or prejudice arising therefrom. *Howell,* 185 S.W.3d at 326. Accordingly, if this Court determines that either prong is not met, we may forego consideration of the other

prong. *Carpenter v. State,* 126 S.W.3d 879, 886 (Tenn.2004).

### A. Deficient Performance

■ As set forth above, the Petitioner contends that his lawyer's performance at trial was deficient insofar as counsel was not aware of, and did not follow, the procedural mandates of *Mathis.* We agree with the Court of Criminal Appeals that trial counsel's uninformed handling of the motion for judgment of acquittal fell below the standard of conduct required of criminal defense attorneys.

As recognized by the Court of Criminal Appeals in the direct appeal of the Petitioner's trial, *Mathis* holds that a defendant waives his or her right to appeal from a trial court's refusal to grant a motion for judgment of acquittal if the defendant continues to participate in the trial after the close of the State's proof. *Mathis,* 590 S.W.2d at 453. Thus, if a defendant moves for a judgment of acquittal at the close of the State's proof and the trial court does not grant the motion, the defendant is faced with a difficult choice. As recognized by the Connecticut Supreme Court,

> Under the waiver rule, when a motion for [a judgment of] acquittal at the close of the state's case is denied, a defendant may not secure appellate review of the trial court's ruling without foregoing the right to put on evidence in his or her own behalf. The defendant's sole remedy is to remain silent and, if convicted, to seek reversal of the conviction because of insufficiency of the state's evidence. If the defendant elects to introduce evidence, the appellate review encompasses the evidence in toto. The defendant then runs the risk that the testimony of defense witnesses will fill an evidentiary gap in the state's case. The waiver rule, therefore, forces the defendant to choose between waiv-

ing the right to [present] a defense and waiving the right to put the state to its proof.

*State v. Rutan,* 194 Conn. 438, 479 A.2d 1209, 1210–11 (Conn.1984).

Whether or not to place an accused on the horns of this particular dilemma has been the topic of ongoing discussion in other states. *See, e.g., State v. Perkins,* 271 Conn. 218, 856 A.2d 917, 927–37 (Conn. 2004); *State v. Simpson,* 64 Haw. 363, 641 P.2d 320, 325–26 (Haw.1982); *State v. Copes,* 244 Kan. 604, 772 P.2d 742, 743–746 (Kan.1989); *State v. Smith,* 332 So.2d 773, 774–77 (La.1976). Justice Katz of the Connecticut Supreme Court has opined that " 'This choice in essence compels a defendant to aid in his own prosecution and lessens the prosecutor's burden to prove each and every element of the case beyond a reasonable doubt.' " *Perkins,* 856 A.2d at 953 (Katz, J., dissenting) (quoting *In re Anthony J.,* 117 Cal.App.4th 718, 11 Cal.Rptr.3d 865, 875–76 (Cal.Ct.App. 2004)). Writing for the majority in favor of applying the waiver rule, Justice Borden of the Connecticut Supreme Court asserted, "[t]he waiver rule supports fact-finding and the ultimate truth seeking function of a trial. In this regard, the waiver rule eliminates the bizarre result that could occur in its absence, namely, that a conviction could be reversed for evidentiary insufficiency, despite evidence in the record sufficiently establishing guilt." *Id.* at 932–33 (citations omitted). The majority of jurisdictions apply the waiver rule.[6] *See id.* at 932 n. 23. This Court decided *Mathis* in 1979. To date it has not been limited or overruled. Defense counsel should have been aware of the significance of *Mathis* and should have made an informed

tactical decision about how to proceed when the trial court erroneously took his motion for judgment of acquittal under advisement. Defense counsel failed in this regard. While we are sensitive to the conundrum facing defense lawyers under its holding, we need not revisit our decision in *Mathis* in this case unless we determine that the proof was insufficient to support the Petitioner's convictions as of the close of the State's case-in-chief.

### B. Prejudice to Defense

The Petitioner alleges that had his lawyer stood on the motion for judgment of acquittal, the Petitioner would have had his convictions reversed on direct appeal due to insufficient evidence. Thus, he argues, his defense lawyer's inadvertent and uninformed waiver of appellate review of the motion prejudiced the defense. Accordingly, in order to assess the prejudice prong of the Petitioner's claim of ineffective assistance of counsel, we must determine whether the evidence was sufficient as of the close of the State's proof to support a denial of the Petitioner's motion for judgment of acquittal. If the State's proof was sufficient to withstand the motion, then trial counsel's failure to stand on the motion and challenge its denial on direct appeal did not prejudice the Petitioner because the appeal would have been denied on its merits.

This determination requires us to "look only at all the evidence introduced by the State, to take the strongest legitimate view of it in favor of the State, and to allow all reasonable inferences from it in the State's favor." *State v. Hall,* 656

---

**6.** Federal Rule of Criminal Procedure 29 was amended in 1994 to allow a trial court to reserve ruling on a motion for judgment of acquittal. *See* Fed.R.Crim.P. 29(b). In that event, the trial court "must decide the motion on the basis of the evidence at the time the ruling was reserved." *Id.* The Advisory Committee Notes point out that, in reviewing the trial court's ruling, "the appellate court would be similarly limited."

S.W.2d 60, 61 (Tenn.Crim.App.1983); *see also State v. Carroll,* 36 S.W.3d 854, 869 (Tenn.Crim.App.1999) (applying the standard used when reviewing the sufficiency of the evidence). We may deem evidence sufficient when it allows *any* rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Bland,* 958 S.W.2d 651, 659 (Tenn.1997). A judgment of acquittal is not an all or nothing proposition. A court may grant a judgment of acquittal as to the higher charge and proceed on a lesser-included offense. *See, e.g., State v. McKinney,* 603 S.W.2d 755, 758 (Tenn.Crim.App.1980) (affirming conviction of second degree murder after trial court directed a verdict of acquittal as to first degree murder); *Post v. State,* 580 S.W.2d 801, 806 (Tenn.Crim. App.1979) (affirming conviction of simple possession of marijuana after trial court directed verdict of acquittal on greater charge of possession with intent to sell).

## II. The Petitioner's Convictions

The jury convicted the Petitioner of facilitating the first degree premeditated murder of Ben White, facilitating the attempted first degree premeditated murders of Jerome Jones and Leo White, and facilitating the aggravated assaults of Jerome Jones and Leo White. The trial court merged these latter two convictions with the two convictions of facilitation of attempted first degree murder.

Our criminal code provides that "[a] person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39–11–402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Tenn.Code Ann. § 39–11–403(a) (2006).[7] The Sentencing Commission Comments to this section explain, "The section states a theory of vicarious responsibility because it applies to a person who facilitates criminal conduct of another by knowingly furnishing substantial assistance to the perpetrator of a felony, but who lacks the intent to promote or assist in, or benefit from, the felony's commission."

▬▬▬ First degree premeditated murder is defined as "[a] premeditated and intentional killing of another." Tenn.Code Ann. § 39–13–202(a)(1) (2006). A premeditated killing is one "done after the exercise of reflection and judgment." *Id.* at (d).

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* Premeditation may be inferred from the manner and circumstances of the killing. *Bland,* 958 S.W.2d at 660. Factors tending to demonstrate premeditation include the use of a deadly weapon upon an unarmed victim and declarations by the accused of an intent to kill. *Id.* Other circumstances supporting an inference of premeditation include lack of provocation, *State v. Anderson,* 835 S.W.2d 600, 605 (Tenn.Crim.App.1992), and the accused's

---

7. We cite to the current version of Tennessee Code Annotated because there has been no substantive change to the cited subsection during the period since the crimes were committed.

failure to render aid to the victim, *State v. Fugate*, 776 S.W.2d 541, 545 (Tenn.Crim. App.1988). An "intentional" killing is one committed by a person "who acts intentionally with respect ... to a result of the conduct when it is the person's conscious objective or desire to ... cause the result." Tenn.Code Ann. § 39–11–302(a) (2006).

In this case, the evidence is sufficient to support the Petitioner's conviction of facilitating the first degree premeditated murder of Ben White if it establishes that the Petitioner provided one or both of his cohorts with substantial assistance, knowing that one or both of his cohorts intended to commit the premeditated murder, but without the intent to promote or benefit from the murder. *See State v. Rice*, 184 S.W.3d 646, 676 (Tenn.2006); *State v. Jackson*, 52 S.W.3d 661, 666 (Tenn.Crim. App.2001) (jury convicted defendant of facilitating first degree murder by finding that he "knowingly furnished substantial assistance in the murder while knowing that others intended to murder the victim"). Our review of the evidence convinces us that the State had adduced sufficient evidence at the close of its case-in-chief to support the Petitioner's conviction of facilitating the first degree premeditated murder of Ben White.

Taking this evidence in the light most favorable to the State and drawing all reasonable inferences therefrom, the State established that Jones and the Petitioner had an argument on the day before the gunfight. Later that same day, both Jones and Sanders saw the Petitioner carrying a handgun in the vicinity of Jones' apartment. The next day, the Petitioner and two of his cohorts visited Jones at Jones' apartment. They accused Jones of threatening to kill the Petitioner. In the Petitioner's presence, Huey pistol-whipped Jones and then tried to take Jones outside with the stated intention of shooting him.

When Jones' cousin intervened, Huey let go of Jones and warned Jones' cousin to mind his own business. Huey left the apartment, fired his gun into the air, and declared, "that will teach them to mess with my family."

Later that evening, the Petitioner, Huey, and Gills were seen together near Jones' apartment immediately before the gunfight began. Stevens and Sanders each saw Gills firing a gun. Works and Goff saw Huey with a long gun, and Goff testified that she saw Huey shooting the gun. The shots were fired toward the area in which Ben and Leo White were standing and which Jones was beginning to leave. The evidence gathered at the scene of the crimes established that at least three guns had been fired from the vicinity in which the Petitioner, Huey, and Gills had been seen during the gunfight. Specifically, Steve Scott testified that two different nine-millimeter guns and an assault-style rifle were fired from the area extending from the corner of the building into the street. The State adduced no testimony placing anyone other than the three defendants in that area. No witness saw either Huey or Gills with more than one gun. A bullet of the type shot by an assault rifle was recovered during Ben White's emergency treatment. While no witness for the State testified to having seen the Petitioner holding or firing a gun on the night of the gunfight, a reasonable inference is that he shot one of the two nine-millimeter guns fired from this area.

The testimony at trial established that the defendants formed a firing line while at least two of them aimed their weapons toward a group of unarmed persons, and, without provocation, opened fire. While accompanied by the Petitioner, Huey had been heard threatening to shoot Jones earlier that day. A total of seventeen shell casings fired from at least three different

guns was found in the area in which the defendants were seen during the gunfire. Two bullets struck and killed Ben White. A third bullet struck and injured Leo White. The defendants rendered no aid to their victims. This proof establishes that one or more of the defendants shot and killed Ben White intentionally and with premeditation It further establishes that one or more of the defendants intentionally and with premeditation attempted to shoot and kill Leo White and Jerome Jones.

Under the facts and circumstances of this case, it is reasonable to infer that the Petitioner fired one of the nine-millimeter weapons. Even if he did not fire directly at any of the victims, his participation in the gunfight supports the conclusion that he provided substantial assistance to Huey and Gills. Accordingly, as of the close of the State's case-in-chief, the proof was sufficient to support the Petitioner's conviction of facilitating the first degree murder of Ben White.

■ The same proof also supports the Petitioner's convictions of facilitating the attempted first degree murders of Leo White and Jerome Jones. Witnesses saw Huey and Gills open fire while Jones was in the general vicinity of his uncles. Leo White testified that the shots which hit him and his brother Ben came from the direction in which Huey, Gills and the Petitioner were seen. Leo was hit by one of the bullets. Jones was able to avoid being hit by running onto his porch and then up the stairs in the breezeway. Nevertheless, he was the victim of an attempted premeditated murder. The Petitioner facilitated the commission of these two attempted first degree premeditated murders in the same manner that he facilitated the first degree murder of Ben White.

■ Because the State's proof at the close of its case-in-chief was sufficient to support the Petitioner's convictions, which are lesser-included offenses of the crimes which with he was charged, the Petitioner suffered no prejudice by the manner in which his lawyer handled the motion for judgment of acquittal. Had counsel insisted the trial court rule and had the trial court then denied the motion, the Petitioner would not have been entitled to a reversal on direct appeal even had his lawyer stood on the motion. Accordingly, because he has failed to establish that his lawyer's performance prejudiced him, the Petitioner is not entitled to post-conviction relief. It is therefore unnecessary for us to address the Petitioner's contention that his proper remedy is the entry of a judgment of acquittal.

## CONCLUSION

Because the evidence adduced by the State during its case-in-chief was sufficient to support a denial of the Petitioner's motion for judgment of acquittal at the close of the State's proof, defense counsel's failure to stand on his motion and his continued participation in the trial did not prejudice the Petitioner because any consideration of the issue on direct appeal would have resulted in a denial on the merits. Accordingly, the Petitioner is not entitled to post-conviction relief on the basis of ineffective assistance of counsel.

The judgment of the Court of Criminal Appeals granting the Petitioner post-conviction relief is reversed. The judgments of conviction entered by the trial court in this matter are reinstated. It appearing that the Petitioner is indigent, the costs of this cause are taxed to the State of Tennessee, for which execution may issue if necessary.