# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs July 25, 2012

## JAMILA NUNN v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Hamilton County**
**No. 280151      Jon Kerry Blackwood, Senior Judge**

**No. E2012-00324-CCA-R3-PC - Filed November 30, 2012**

A Hamilton County jury convicted petitioner, Jamila Nunn, of aggravated child abuse, a Class A felony, for which the trial court ordered a twenty-year sentence. Following the direct appeal, petitioner filed a petition for post-conviction relief alleging ineffective assistance of counsel. The trial court denied post-conviction relief, and petitioner now appeals. Following our review of the record, the parties' briefs, and applicable case law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and ROBERT W. WEDEMEYER, JJ., joined.

Ardena J. Garth, District Public Defender; Karla Gothard, Executive Assistant District Public Defender; and Richard Kenneth Mabee, Assistant District Public Defender, Chattanooga, Tennessee, for the appellant, Jamila Nunn.

Robert E. Cooper, Jr., Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; William H. Cox, III, District Attorney General; and Lance Pope, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## I. Facts

### A. Trial

On direct appeal, this court summarized the facts developed at trial as follows:

The evidence reflects [that petitioner's son] D.J. suffered serious bodily injury resulting from child abuse. His pediatricians and grandmother testified that D.J. was a normal, happy, and active baby, in spite of his premature birth. After his parents called 9-1-1 on September 5, 2002, because he was not breathing and was "limp" and unconscious, D.J. was rushed to the emergency room by ambulance and transferred to the pediatric intensive care unit. He was diagnosed with retinal hemorrhages in one eye; a subdural hematoma; a liver laceration that tore his liver almost completely into two parts and that caused extensive internal bleeding in his abdomen; a bruised kidney; an injured pancreas; and fractures to his skull, arm, and leg that had been inflicted at different times, including shortly before D.J. was transported to the hospital.

The evidence showed D.J. had multiple seizures while at the hospital, his eyes were unresponsive to light when emergency medical services arrived at his home, and his brain swelled from the injury that caused the subdural hematoma. The testimony reflected that D.J.'s brain was dying due to lack of oxygen and that without expert medical intervention, D.J. would have died. The physicians' testimony was that the injuries would have caused terrible pain to D.J. and that he would have been screaming after the injuries to his abdomen were inflicted. Dr. Keegan also stated that D.J.'s brain was smaller after parts of it died, rendering his face large for his diminished skull size. He said D.J. could not control his body's movements, including holding himself upright; could not breathe on his own; could not eat unless through a feeding tube; could not see well if he could see at all; and could not carry on a conversation if he could speak, which his grandmother said he could do on an extremely limited basis. The three physicians testified that R.S.V., pneumonia, and CPR do not cause all the injuries D.J. sustained, and they also stated that in their professional opinion, D.J.'s injuries were caused by child abuse. Dr. Keegan testified that the Defendants' assertion that D.J. choked on mucous from R.S.V. and pneumonia and then went limp while he was being placed in his car seat did not explain his extensive, life-threatening injuries.

*State v. Derrell F. Nunn Sr. and Jamila Nunn*, No. E2007-02333-CCA-R3-CD, 2009 WL 4790211, at *23 (Tenn. Crim. App. Dec. 14, 2009), *perm. app. denied*, (Tenn. May 12, 2010). Based on the foregoing evidence, the jury convicted petitioner of aggravated child abuse. Petitioner appealed her conviction, contending that the evidence at trial was insufficient to convict her.[1] *Id.* at *1. This court affirmed the judgment of conviction. *Id.*

## B. Post-Conviction

Petitioner filed a petition for post-conviction relief on May 10, 2011. The post-conviction court held a hearing on the petition on December 15, 2011, at which petitioner presented the following evidence:

Petitioner testified that she met trial counsel through trial counsel's partner, who represented petitioner in a juvenile court case related to the underlying case. The court appointed trial counsel to represent petitioner in early 2003. Petitioner said she never met with trial counsel at trial counsel's office, and "the majority of the time [she] spoke with her, it was right before court and then after court." Petitioner stated that she only communicated with trial counsel when trial counsel made "quick phone call[s] letting [petitioner] know when [she] was going to have court again[] and then before court and after court for a few minutes." Petitioner and trial counsel discussed the facts of the case and what would happen at the hearings they attended. After the hearings, trial counsel explained what happened at the hearing and what would happen the next time petitioner was scheduled to be in court.

Petitioner stated that she and trial counsel did not discuss her potential sentence if convicted and that she did not discover the potential length of her sentence until "right before" the sentencing hearing. Trial counsel and the State did not engage in any plea negotiations, and the State did not extend any plea offers to petitioner. Petitioner testified that she did not know what would happen during her jury trial. She said trial counsel prepared her for trial during a fifteen-minute telephone call. According to petitioner, the majority of that conversation consisted of trial counsel telling her what not to wear to court. She stated that trial counsel told her the trial would likely take "two or three days and then [petitioner would] get back on with [her] normal life." Petitioner further stated that she did not have previous experience with criminal law, and before this case, she had only been in a courtroom for jury duty.

Petitioner stated that she would have testified at her trial if she had known there would be no defense witnesses. She further stated that she "would have done anything to clear [her]

[1] Petitioner and her husband, Derrell F. Nunn Sr. ("the co-defendant") were tried together and jointly pursued the direct appeal. However, the co-defendant is not a party to the present appeal.

name." She said that during their fifteen-minute trial preparation conversation, trial counsel told her she would not be testifying. Petitioner recalled the trial court's conducting a hearing at trial during which the court asked her if she wanted to testify. She further recalled telling the court that she did not want to testify and that she and trial counsel had discussed her decision. She said she told the court that she and trial counsel discussed her decision to not testify because she was "naive" and thought it was best to do what her attorney told her to do.

Petitioner said if she had testified at trial, she would have told the jury about how important her family was to her, the type of person she was, and how she tried to be a good person and a witness for Christ. She further said, "I want to be able to just stand up for myself and tell them that's not who I am and they're trying to create a picture of what they think I am, and that's not me."

Petitioner obtained her high school diploma and graduated from Jacksonville State University with a bachelor's degree in marketing. She was involved in several activities during high school and college. She stated that she was not a "party girl" in college and never smoked, drank alcohol, or used drugs. Petitioner met the co-defendant in high school, and they began dating her senior year of college. She graduated college one year before him. She became pregnant with their son D.J., the victim in this case, immediately after the co-defendant graduated from college. Petitioner said both her family and the co-defendant's family were excited about the arrival of D.J. After he graduated from college, the co-defendant accepted a job in Chattanooga, Tennessee, but petitioner stayed in Birmingham, Alabama, where she had been living. However, after the terrorist attacks on September 11, 2001, petitioner decided to move to Chattanooga to be with the co-defendant.

Petitioner stated that during a prenatal appointment, her doctor discovered that food was not getting to D.J. through the umbilical cord. He was not growing and would not be able to grow in her womb, so the doctor decided to perform an emergency caesarean section birth. D.J. was born seven weeks premature and remained in the hospital for three to four weeks after his birth.

Petitioner testified that anytime something "out of the ordinary" occurred with D.J., she would call D.J.'s pediatrician, her mother, and her mother-in-law, who was a nurse. She stated that she also called the "nurses['] hotline" because she

> wanted to give [her] child proper care, . . . but then, too, also so they would know . . . if something came along later on, it would be, like, "Okay, well, I called you about this[,] but does it have anything to do with this[?]," and it would be something that they had documented as well.

Petitioner recalled that D.J. was not "keeping his milk down" two weeks before he was hospitalized for the events in this case. She stated he would vomit the milk, and it "was kind of the basic thing then." Petitioner said on a Saturday night during these two weeks, D.J. was making an "'mmm' type of sound." She checked on him, and "he had his arms . . . straight out with his eyes kind of like rolling the back of his head." Petitioner dialed 9-1-1 for an ambulance, but the operator told her it was not an emergency. She and the co-defendant drove D.J. to the hospital. According to petitioner, D.J.'s body was so stiff that he could not sit in his car seat, and she had to sit in the backseat and hold him during the drive to the hospital. After examining D.J., hospital personnel advised petitioner that D.J. had suffered from a febrile seizure due to his having a temperature of 103. Petitioner said D.J.'s temperature had not been at such a high level for very long.

A doctor at the hospital also diagnosed D.J. with respiratory syncytial virus ("R.S.V."). Petitioner stated that she learned of R.S.V. while pregnant and said it was a respiratory virus that was especially harmful to premature babies. She called her mother-in-law, who told her D.J. needed to be hospitalized. However, the doctors at the hospital told petitioner to take him to see his pediatrician the following Monday. Petitioner brought D.J. to his pediatrician as directed, and the pediatrician advised her that D.J. also had "a hint of pneumonia" in addition to the vomiting and R.S.V. The doctor further told petitioner that D.J. had "elevated liver function."

Petitioner testified that on the day of the incident underlying this case, the owner of D.J.'s daycare volunteered to babysit D.J. at her home because he was sick. That morning, petitioner gave D.J. his medicine for the R.S.V. and pneumonia, fed him, and packed his supplies for the day. The co-defendant left to take D.J. to the babysitter, and petitioner began getting ready for work. While getting ready, petitioner realized that the co-defendant had not yet started his vehicle. She looked out of the window and saw the co-defendant reaching to pull D.J. out of the car seat. Petitioner ran outside to the co-defendant's vehicle, and the co-defendant said, "'He did it again.'" She stated that D.J. was acting like he was going to vomit and was inhaling but not exhaling.

Petitioner stated that she ran inside of her house and called 9-1-1. An ambulance arrived and transported D.J. to the hospital with petitioner and the co-defendant following in their vehicle. D.J. was admitted into the emergency room, and petitioner and the co-defendant were told to go to the waiting room. Eventually a member of the hospital staff went to the waiting room and told petitioner and the co-defendant that D.J. had shaken child syndrome. Petitioner denied ever shaking or throwing D.J. She stated that she had never seen the co-defendant abuse D.J. She stated that if she had ever seen the co-defendant abuse

D.J., "He would get it." According to petitioner, nobody spoke to her about the possibility that she abused D.J. during the previous hospital visit when he was diagnosed with R.S.V.

On cross-examination, petitioner admitted that she had eighteen court dates prior to her trial and that she spoke with trial counsel at these court dates. She further admitted that trial counsel called her to inform her of upcoming court dates. Petitioner stated that trial counsel also advised her when she filed motions. She said she did not have an in-depth understanding of the motions filed by trial counsel but agreed that trial counsel would have a better understanding of them because she was an attorney. Petitioner did not recall trial counsel's filing a motion for a bill of particulars or the trial court's granting the motion but said if the transcript reflected she was present for the hearing, she agreed it had occurred. Petitioner testified that she did not remember trial counsel's filing several different motions or discussing those motions with trial counsel. However, she did not dispute that trial counsel filed the motions and discussed them with her.

Petitioner testified that she recalled trial counsel's filing a motion for a copy of a "confession" petitioner made. She stated that this confession was an audio recording of her and the co-defendant while they were at the hospital and that she discussed the recording with trial counsel She told trial counsel that the recording did not contain anything incriminating and that she had told the truth during the recording.

Petitioner stated that trial counsel filed a motion to sever her trial from the trial of the co-defendant. Trial counsel and the co-defendant's attorney discussed the motion with petitioner and co-defendant, including the pros and cons of severance. Petitioner said she and the co-defendant chose not to sever their trials because they decided that it was best for them to stand trial together. She explained, "[The charges were] against both of us, and both us knew that we didn't do anything, so there wasn't a reason to separate us."

Petitioner testified that she was incarcerated for two weeks after her arrest. She stated that her husband's aunt posted her bond, and she was released. Petitioner did not know whether the court had reduced her bond but said she was released after attending a hearing. She recalled being upset after the hearing because she did not think her motion was granted, but when she returned to jail, she discovered her husband's aunt had paid her bond. Petitioner did not remember if she talked to trial counsel about her bond reduction and was unsure who represented her during that time because she had "a few attorneys along the way."

Petitioner stated that she did not make the decision not to testify and that "it was kind of told to [her] that [she] wouldn't be . . . testifying." She said when the trial judge questioned her regarding her decision whether to testify, she "probably" did not tell the judge

that someone told her she would not be testifying because the judge did not ask her. She further said that the testimony she gave on direct examination during the post-conviction hearing is what she would have testified to at trial She recalled that she gave a statement to Sergeant Kevin Akins of the Chattanooga Police Department at the hospital on September 5th and that the statement was admitted during her trial. She agreed that her statement to Sergeant Akins was "substantially similar, if not exactly the same" as her testimony at the post-conviction hearing.

On redirect examination, petitioner testified that although she met with trial counsel eighteen times at the courthouse, she never met with trial counsel at her law office. Petitioner stated that she and trial counsel never discussed her possible sentence. According to petitioner, the first time trial counsel told her about the possibility of incarceration was while the jury was deliberating. Petitioner said her statement to Sergeant Akins did not include the information about the medical problems that D.J. had during the two weeks prior to September 5th.

Joyce Graves, petitioner's mother, testified that she excitedly anticipated D.J.'s birth. She explained that D.J. was the first grandson on both sides of his family, "so there was a lot of shopping and hoopla and all of that type of stuff." She watched petitioner interact with D.J. and observed that petitioner was a "loving and slightly overprotective mom." She said petitioner was a first-time mom and was concerned about everything. Mrs. Graves said she missed petitioner and D.J. when they moved to Chattanooga, but she visited them often. She stated that petitioner never tried to keep her away from D.J. She never saw petitioner hit, shake, kick, or throw D.J. She stated that she always heard from petitioner when something was wrong with D.J. She denied that D.J. was in an unsafe situation and stated that if D.J. was in unsafe situation, she would have removed him from it or reported it.

Mrs. Graves testified that the co-defendant's mother, Sherry Daniel, gained custody of D.J. after he was released from the hospital. She said that she and Ms. Daniel brought D.J. to a doctor's office in Alabama and requested a thorough examination of him. The doctors gave Mrs. Graves a report of their examination. The report stated that D.J. underwent a CT scan and that the doctors diagnosed him with anoxic brain disorder. The CT scan did not indicate any specific abnormalities in D.J.'s pelvic area. Mrs. Graves testified that they gave the report to trial counsel, but trial counsel did not use it during the trial.

On cross-examination, Mrs. Graves admitted that the examination she and Ms. Daniel arranged for D.J. occurred on July 3, 2003, approximately ten months after September 5, 2002, the date that D.J. was transported to the emergency room. She agreed that the report listed Ms. Daniel as D.J.'s guardian and that Ms. Daniel testified at trial.

Willie G. Graves, petitioner's father, testified that petitioner and co-defendant had a "lovely" relationship. He stated that D.J. was his first grandchild, and he was very proud of petitioner and the co-defendant. He further stated that petitioner was proud of D.J. and took him "pretty much [everywhere] she went." Mr. Graves stated that his family was always welcome at petitioner's house, and if his family was not there, the co-defendant's family was there.

According to Mr. Graves, petitioner called Mrs. Graves almost every night. During the conversations, petitioner would mention if she had called the nurse's hotline and if she called Ms. Daniel for advice. He never saw petitioner abuse D.J. He said that if D.J. was in an unsafe environment, he would have removed him from that environment and reported petitioner and the co-defendant. He stated that he attended almost all of petitioner's court dates. He did not recall any conversations petitioner had with trial counsel.

After hearing the evidence, the post-conviction court took the matter under advisement. On January 9, 2012, the court entered a written order making several findings of fact and denying the petition for post-conviction relief. Petitioner appeals the post-conviction court's denial of relief.

## II. Analysis

### *Standard of Review*

To obtain relief in a post-conviction proceeding, a petitioner must demonstrate that his or her "conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2006). A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2006); *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010) (citing *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009)). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Lane*, 316 S.W.3d at 562 (quoting *Grindstaff*, 297 S.W.3d at 216).

Appellate courts do not reassess the trial court's determination of the credibility of witnesses. *Dellinger v. State*, 279 S.W.3d 282, 292 (Tenn. 2009) (citing *R.D.S. v. State*, 245 S.W.3d 356, 362 (Tenn. 2008)). Questions regarding the credibility of witnesses are matters entrusted to the trial judge as the trier of fact. *Dellinger*, 279 S.W.3d at 292 (citing *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). The post-conviction court's findings of fact carry the weight of a jury verdict and are conclusive on appeal unless the preponderance of the evidence is otherwise. *Rigger v. State*, 341 S.W.3d 299, 307 (Tenn. Crim. App. 2010) (citing

*Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997)). However, conclusions of law receive no presumption of correctness on appeal. *Rigger*, 341 S.W.3d at 307 (citing *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001)). As a mixed question of law and fact, this court's review of petitioner's ineffective assistance of counsel claims is de novo with no presumption of correctness. *Dellinger*, 279 S.W.3d at 294 (citing *Finch v. State*, 226 S.W.3d 307, 315 (Tenn. 2007)).

The Sixth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, and article I, section 9 of the Tennessee Constitution require that a criminal defendant receive effective assistance of counsel. *Cauthern v. State*, 145 S.W.3d 571, 598 (Tenn. 2004) (citing *Baxter v. Rose*, 523 S.W.2d 930 (Tenn.1975)). The constitutional right to counsel attaches when adversarial judicial proceedings are initiated against the defendant. *State v. Mitchell*, 593 S.W.2d 280, 286 (Tenn. 1980). "Initiation" is construed as issuance of an arrest warrant, the time of the preliminary hearing in cases where an arrest warrant is not first issued, or by indictment or presentment issued by a grand jury. *Id.* at 286.

To prevail on her claim of ineffective assistance of counsel, petitioner must demonstrate both that her lawyer's performance was deficient and that the deficiency prejudiced the defense. *Finch*, 226 S.W.3d at 315; *Vaughn v. State*, 202 S.W.3d 106, 116 (Tenn. 2006) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Baxter*, 523 S.W.2d at 936)). To prove that counsel's performance was deficient, petitioner must establish that her attorney's conduct fell below an objective standard of "'reasonableness under prevailing professional norms.'" *Finch*, 226 S.W.3d at 315 (quoting *Strickland*, 466 U.S. at 688). As our supreme court has previously held:

> "[T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence . . . Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations."

*Baxter*, 523 S.W.2d at 934-35 (quoting *Beasley v. United States*, 491 F.2d 687, 696 (6th Cir. 1974)). On appellate review of trial counsel's performance, this court "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 689); s*ee Finch*, 226 S.W.3d at 316.

To establish that petitioner suffered prejudice as a result of counsel's deficient performance, petitioner "'must establish a reasonable probability that but for counsel's errors the result of the proceeding would have been different.'" *Finch*, 226 S.W.3d at 316 (quoting *Vaughn*, 202 S.W.3d at 116). "A 'reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Vaughn*, 202 S.W.3d at 116 (quoting *Strickland*, 466 U.S. at 694); *see Finch*, 226 S.W.3d at 316. As such, petitioner must establish that her attorney's deficient performance was of such magnitude that she was deprived of a fair trial and the reliability of the outcome was called into question. *Vaughn*, 202 S.W.3d at 116 (citing *Strickland*, 466 U.S. at 694; *State v. Burns*, 6 S.W.3d 453, 463 (Tenn. 1999)).

Petitioner must establish both deficient performance and prejudice therefrom to be entitled to post-conviction relief. *Vaughn*, 202 S.W.3d at 116; *Howell*, 185 S.W.3d at 326. It follows that if this court holds that either prong is not met, we are not compelled to consider the other prong. *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004).

On appeal, petitioner argues that the post-conviction court erred in denying her petition for post-conviction relief because trial counsel was ineffective for (1) not allowing petitioner to testify at trial; (2) failing to adequately investigate and prepare the case; and (3) failing to meet with petitioner. The State responds that petitioner failed to prove by clear and convincing evidence that she received ineffective assistance of counsel. We agree with the State.

Petitioner first asserts that trial counsel was deficient for not having her testify at trial. The post-conviction court noted that petitioner did not allege this claim in her petition for post-conviction relief. However, the court allowed petitioner to testify during the post-conviction hearing about what her purported testimony would have been at trial. In its order denying relief, the post-conviction court found that petitioner's testimony was "essentially the same position she took in her statement to [l]aw enforcement which was read to the jury." The court further found that the trial testimony of Ms. Daniel included petitioner's purported testimony about her relationship with D.J. Thus, the post-conviction court found that the issue was not only precluded, it was also without merit.

The evidence does not preponderate against the post-conviction court's findings. Petitioner testified at the post-conviction hearing that the trial court conducted a *Momon*[2] hearing confirming that petitioner made the decision not to testify at trial after discussion with trial counsel. Moreover, petitioner agreed that her statement to Sergeant Akins, which was introduced at trial, was "substantially similar, if not exactly the same" as her testimony at the post-conviction hearing. Petitioner asserts that her statement did not include various

---

[2] *See Momon v. State*, 18 S.W.3d 152, 161-63 (Tenn. 1999).

personal information about her. However, this court's opinion on direct appeal indicates that the testimony of Ms. Daniel covered some of this information. At petitioner's trial, Ms. Daniel testified that she frequently visited the co-defendant, petitioner, and D.J. *Derrell F. Nunn Sr. and Jamila Nunn*, 2009 WL 4790211 at *1. She stated that "D.J. was 'very much loved'" and that petitioner and the co-defendant "were attentive to their new baby." *Id.* Ms. Daniel described D.J. as a "normal and active baby." She also testified at trial that both petitioner and the co-defendant were employed and that D.J. went to daycare. *Id.* Moreover, Ms. Daniel testified regarding petitioner's seeking medical attention for D.J. during the two weeks prior to September 5th. Petitioner has not shown that her failure to testify was a result of deficient performance by trial counsel. Moreover, petitioner has not shown that the result of the proceeding would have been different if she had testified, especially in light of the overwhelming evidence against her. Thus, petitioner has not proven that she was prejudiced and is not entitled to relief on this issue.

Petitioner next argues that trial counsel was deficient in failing to adequately investigate and prepare the case. Specifically, petitioner complains that trial counsel did not conduct case preparation for a six-month period, did not hire an investigator until two and a half years after the court appointed her to represent petitioner, only met with the investigator once, and did not secure a medical expert until four years after her appointment. The post-conviction court found that although no medical expert testified on behalf of petitioner, it did not mean that trial counsel did not consult with a medical expert or use the services of an investigator. The evidence does not preponderate against this finding.

According to trial counsel's claim for attorney fees, which was made an exhibit at the post-conviction hearing[3], trial counsel spent at least five hours reviewing material from investigators, meeting with investigators, and talking with investigators on the telephone. Trial counsel expended eighty-one out-of-court hours working on petitioner's case. At the post-conviction hearing, petitioner did not present any evidence as to how additional consultation with an investigator would have helped her defense. Moreover, the trial record indicates that trial counsel considered employing an expert witness but ultimately decided not to present an expert witness at trial. Petitioner contends that trial counsel was deficient for failing to present an expert witness in her defense; however, petitioner did not present an expert witness at the post-conviction hearing to support this claim. "When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Thus, we conclude that petitioner has failed to meet her burden of proof with respect to this issue.

---

[3] We note that trial counsel did not testify at the post-conviction hearing.

Finally, petitioner asserts that trial counsel was deficient for failing to meet with her. At the post-conviction hearing, petitioner admitted that trial counsel met with her before and after court hearings. During these meetings, they discussed the case, what happened in court, and what was expected to happen at the next court date. Petitioner agreed that there were at least eighteen court appearances at which she met with trial counsel. She did not offer any evidence as to how additional meetings with trial counsel would have aided her defense. Accordingly, we conclude that petitioner has failed to meet her burden of proving trial counsel was deficient in this regard and that trial counsel's alleged deficiency prejudiced her.

## CONCLUSION

For the foregoing reasons, we affirm the post-conviction court's denial of relief.

_____
ROGER A. PAGE, JUDGE