FILED

05/19/2017

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs May 2, 2017

**KELVIN WINN v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 09-04902      James C. Beasley, Jr., Judge**

_____

**No. W2016-02200-CCA-R3-PC**

_____

The Petitioner, Kelvin Winn, was convicted of first degree felony murder and received a
life sentence.  He filed a petition for post-conviction relief, which the post-conviction
court denied.  On appeal, the Petitioner argues that trial counsel's performance was
deficient for failing to: (1) obtain an enhanced version of the surveillance video of the gas
station; (2) proffer actual evidence of the Petitioner's height to the jury; (3) submit the
Petitioner's clothing to be tested for blood; and (4) investigate the State's jailhouse
informant for possible impeachment evidence.  The Petitioner asserts that he was
prejudiced by trial counsel's deficient performance because, absent these deficiencies, the
jury would not have convicted the Petitioner.  Discerning no error in the post-conviction
court's decision, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ALAN E.
GLENN and J. ROSS DYER, JJ., joined.

Bryan R. Huffman, Covington, Tennessee, for the appellant, Kelvin Winn.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel;
Amy P. Weirich, District Attorney General; and Michael McCusker, Assistant District
Attorney General, for the appellee, State of Tennessee.

# OPINION

## I. Factual and Procedural Background

*Jury Trial*

At the Petitioner's trial, the following proof was presented, as summarized by our court in its opinion on the Petitioner's direct appeal:

> This case arises out of the attempted robbery and shooting of the store clerk, Abdallah "Zack" Assaedi, at Sam's Food Market in Memphis on November 21, 2008, for which the [Petitioner] was charged with one count of first degree felony murder.

State's Proof

> Faheid Alsidi testified that the victim was his brother, and he was notified on November 21, 2008, that his brother had been shot and killed.

> Dr. Marco Ross, a forensic pathologist with the Shelby County Medical Examiner's Office, testified that he performed the autopsy on the victim. Dr. Ross noted that the victim suffered a gunshot wound to his left upper eyelid, with the bullet perforating the skull in the brain, which he determined to be the cause of death.

> Sergeant Andrew Brown with the Memphis Police Department testified that he was assigned to uniform patrol the day of the shooting and was dispatched to the scene. When he and his trainee partner arrived, Sergeant Brown met with three witnesses who said that the store clerk had been shot. He went behind the counter and felt that the victim had "a very light pulse." He secured the scene and talked briefly with the witnesses before separating them to insure "the integrity of their information." None of the witnesses could identify the shooter or provide any descriptive information aside from a description of the clothing the shooter was wearing.

> Myron Jones testified that he was a graduate student living in Memphis at the time of the shooting. He went to Sam's Food Market the morning of the shooting to purchase a newspaper and some food, and two other customers were in the store at that time. An individual wearing a Halloween mask came into the store, ran up to the front counter, and said,

"It's a robbery . . . ."  As the victim raised his hands, the gunman shot him in the head, and Jones dropped to the floor.  The gunman then demanded money from Jones, and Jones gave him the two five-dollar bills in his hand.  When the gunman stepped behind the counter to go to the cash register, Jones got up and ran out of the store to his home.  Jones talked to his pastor and then called the police and later gave a statement.  Jones identified portions of the surveillance video and still photographs taken from the footage.  On cross-examination, Jones said that he only got to look at the gunman for "a minute[ ] or two" and that his face was covered with "a Halloween mask with slits over his eyes."  In looking at one of the photographs, Jones noted that the gun was in the gunman's left hand.  However, he acknowledged that he had incorrectly stated in his statement to the police that the gun was in the gunman's right hand.

The video showed the suspect approach Sam's Food Market but stop in the alcove next to the entrance for several minutes.  The masked man then entered the store, shot the victim, took cash from Jones, tried to open the cash register, and fled the scene.  Still photographs taken from the video detailed that the man was wearing dark clothing, a mask, and white gloves and that he shot the victim with a gun held in his left hand.

Joseph Mario Williams testified that he worked at Sam's Food Market in November 2008.  On the morning of November 20, the day before the shooting, Williams and the victim were working in the store, and Williams started to exit the store to clean up the grounds outside.  As he was walking out the front door, Williams noticed "a guy with a dark sweater, or coat on, and he had the hood up, he had his hands in his pocket and his head down . . . .  [H]e lift[ed] up his head and he had a mask on."  When the masked man saw Williams, he turned around and walked away from the store.  The mask was clear plastic, allowing Williams to discern that the man was African–American, and had a "smiley face on it."  Williams estimated that the man was 5'8".  He called the police and reported the encounter that day.

Williams testified that, the following morning, he arrived at the store shortly after 7:00 a.m.  He was working in the deli area around 8:30 when the robbery and shooting occurred.  As he was hiding after the shooting, Williams observed that the gunman was the same man who had been at the store the previous day, noting he had on "[t]hat mask, the clothing, same clothing, hood on and that mask, that clear mask with that smiling face on it[.]"  He saw the man trying to open the cash register.  When the register

would not open, the man stepped over the victim's body, picked up some money off the floor, and ran out of the store. Williams identified portions of the store's surveillance video and still photographs taken from the footage in his testimony.

Patricia Jean testified that she lived next door to Sam's Food Market at the time of the shooting and was walking to the store around 8:30 a.m. on the day thereof. As she passed an alcove between her house and the store, she noticed a man wearing a black hooded sweatshirt, jeans, and black shoes sitting in the alcove with his hands in his pockets. She was only able to see the front part of the man's face because he had his hood up, but she saw that he had a "little spot," such as a birthmark or freckle, on the right side of his face. The man asked her for a quarter, to which she responded that she would see if she had one when she returned from the store.

Jean testified that she went in the store and saw Williams, the victim, and a man she knew as "Brother." When she came out and passed the alcove, the man again asked her for a quarter, but she told him that she did not have one. She said that the second time, the man "raised his head up a little bit more, so [she] could see a little bit better, but that's it. Everything else [wa]s the same." She returned to her house after talking to a friend, and the police arrived a couple of hours later to investigate the shooting at the store. Jean was taken to the police station, where she spoke with Sergeant James Terry Max and relayed her encounter with the man outside the store. After giving her statement, Sergeant Max gave her a ride home from the station, during which she recalled the birthmark on the man's face and told the officer that she could identify the man who asked her for money.

During the course of the investigation, officers showed Jean five different photographic arrays, on November 24, 2008, two on November 29, 2008, January 9, 2009, and January 11, 2009, each containing six pictures. Jean did not observe the individual who had asked her for money in any of the first four arrays; however, she was able to make an identification from the final array. Jean identified the [Petitioner] in court as the man she spoke with outside of Sam's Food Market the morning of the shooting.

Jean also identified portions of the store's surveillance video and still photographs taken from the footage in her testimony. She identified herself and the man who asked her for money in several stills, including

one that showed the man entering the market wearing gloves within the minutes preceding the shooting.

On cross-examination, Jean admitted that the only person in the final photographic array with a mole, birthmark, or freckle on the right side of his face was the [Petitioner] and that she received a $1,000 CrimeStoppers' tip after making an identification. However, she was not apprised that she would receive money for making an identification until after she had already identified the [Petitioner]. Jean admitted that when the man outside the store asked her for a quarter, she kept walking and did not stop to talk to him, explaining that she talked to him while looking over her shoulder as she continued to walk. She estimated that she talked to him for less than a minute on her way in and out of the store.

. . . .

Officer Darnell Gooch with the Memphis Police Department testified that he was directed to a residence by homicide investigators on January 10, 2009, to get information from the [Petitioner] so he could be contacted in the future. Officer Gooch noted that the [Petitioner] wrote down his name, birth date, and social security number using his left hand. Officer Gooch recalled that the [Petitioner]'s hair was "in braids, going to the back and it was kind of short above the collar."

. . . .

Trinika Meredith, with the Shelby County Sheriff's Office, testified as keeper of records to the dates and locations that the [Petitioner] and Antonio Johnson were housed in the Shelby County Jail. From February 6, 2009 until February 11, 2009, the two were housed on the second floor, a floor designated for inmates with medical conditions, in the same pod. The two were allowed out of their cells for six hours every day, along with other inmates of the pod level. On February 11, 2009, Johnson was moved to the fourth floor but returned to the second floor on February 13, again in the same pod as the [Petitioner], where they both remained until March 4, 2009.

Antonio Johnson, who acknowledged a rather extensive criminal history, testified that he contacted the Memphis Police Department on February 12, 2009, to give them information concerning the [Petitioner]. He explained that he met the [Petitioner] in court on February 6, 2009, and

the [Petitioner] "was just blabbing off at the mouth about what was going on." The [Petitioner] was moved into the same pod as him later that night and begun discussing the details of his case with Johnson.

Johnson testified that the [Petitioner] told him that, in November 2009, he went to a store to commit a robbery but was unable to because "he was detoured by some people." The second time, the [Petitioner] went in with his gun in hand, demanded money from the cash register, and shot the clerk in the face. The [Petitioner] said that there was a customer in the store who "fell to the ground" upon seeing the [Petitioner], and the [Petitioner] took money from him before fleeing the store. The [Petitioner] told Johnson that he was wearing a "black hoody, some gloves, [and] some black Gucci pants" and that his hair was "in a little Afro like then, or in braids" at the time of the robbery and shooting. The [Petitioner] also indicated that he wore a mask.

Johnson testified that he contacted the homicide bureau and eventually spoke with Sergeant Max. He said that he had an occasion to talk to the [Petitioner] again, after which he wrote down a few notes, and the [Petitioner] told him that his brother dropped him off at the store prior to the incident in a four-door, white 1999 Mercury. Johnson assisted the [Petitioner] in trying to contact his brother "to use him as an alibi." On February 12, 2009, he was shown a photographic array, from which he identified the [Petitioner]. Johnson stated that he was not prompted by the police or anyone in the prosecutor's office to obtain incriminating statements from the [Petitioner].

On cross-examination, Johnson testified that the day after he spoke to Sergeant Max, he was moved to general population on the fourth floor of the jail. When he got a chance to the use the phone, he called Sergeant Max to see if he was able to get him moved back to the second floor because he believed that his "life was in jeopardy in that pod, because [the Petitioner] was affiliated with the G[angster] D[isciples]." However, he had no expectation that he could receive a favor from Sergeant Max. Johnson said that it was his idea to take notes of his second conversation with the [Petitioner], and his getting moved back to the second floor was not a "favor for . . . taking the notes." Johnson acknowledged that he was taking several prescription drugs, including one for hallucinations, at the time of his conversations with the [Petitioner].

Sergeant Eric Freeman with the Memphis Police Department testified that, on January 13, 2009, Sergeant Max, the lead investigator on the case, requested that he look for a white Mercury Sable. The car was parked in front of 1620 Pennsylvania Street and was owned by Linda Winn.

Sergeant James Terry Max with the Memphis Police Department testified that he responded to the scene at 10:30 a.m. on November 21, 2008, and served as the lead investigator on the case. Officers downloaded the video from the store's surveillance system. The video from the outdoor cameras showed an individual "walking . . . towards the store. The subject walked into a little alcove, a little covered area, where he was out of view. And . . . at least [ ] two customers walk[ed] by the subject and actually look[ed] at the subject." They determined who the two customers were who talked to the subject and interviewed them. . . . . The other customer, Dallas Jackson, said that he could not identify the individual because he did not get a good look at his face.

. . . .

Sergeant Max testified that he created a fifth photographic array, this one containing the [Petitioner]'s picture. Because the [Petitioner] had an obvious birthmark on his face, he attempted to find other individuals who had "distinctive markings on their face[s]," and those placed in the array bore some sort of discoloration or obvious anomaly in their complexion. The array was shown to Patricia Jean on January 11, 2009, and, within three seconds, she identified the [Petitioner] as the man she spoke with outside Sam's Food Market the morning of the shooting.

Sergeant Max testified that, when the [Petitioner] was arrested and questioned, he denied any involvement in the robbery and shooting. The [Petitioner] claimed that he was in Tunica, Mississippi, around Thanksgiving 2008, as he and his brother had gone there to visit their cousin, Yolanda Winn. The [Petitioner] was not sure of the exact date he went to Tunica but recalled that he returned to Memphis on Thanksgiving Day. The [Petitioner] told Sergeant Max that his mother and girlfriend could verify that he went to Tunica. However, Sergeant Max was unable to verify the alibi, as those he questioned were "[v]ery vague, very vague, no dates . . . . No[ ] one could get [him] the exact date and time frame." The [Petitioner] later requested to speak with Sergeant Max again and, during the conversation, claimed that his brother actually committed the crime.

- 7 -

Sergeant Max noted that they received information that the suspect "had possibly gotten out of a white four-door, like, Pontiac Sunfire type vehicle," and it was later confirmed that the [Petitioner]'s mother owned a four-door, white 1999 Mercury Sable. In addition, on February 12, 2009, Antonio Johnson, an inmate in the jail, called and provided the same information as he testified to above, which Sergeant Max determined to be credible.

[The Petitioner's] Proof

Yolanda Winn, the [Petitioner]'s cousin, testified that she picked up the [Petitioner] at a liquor store in Memphis on November 17 or 18, 2008, and took him to stay with her in Tunica for "a couple of weeks." On November 20, during that two-week period, they went back to Memphis for the [Petitioner] to get "some emergency food stamps" but returned to Tunica the same day. Winn explained that the [Petitioner] does not drive because he has an eye problem. Her sister, Latonya Murrell, brought the [Petitioner] back to Memphis "[a]round the 27th."

Jerold Conley testified that he was outside Sam's Food Market on the morning of November 21, 2008, and did not recall seeing anyone other than Patricia Jean and Dallas Jackson.

Dallas Jackson testified that he was present at Sam's Food Market on the day of the shooting. He recalled speaking to someone who was sitting in the alcove outside the market, but he could not see the man's face and was therefore unable to make an identification when shown a photographic array. He was able to discern that the man "was very dark in complexion."

Linda Winn, the [Petitioner]'s mother, admitted that she owned a white 1999 Mercury Sable. She said that the car was "running hot" and needed a water pump at the time of the offense; therefore, it was parked in her carport and no one was driving it.

Latoya Winn, the [Petitioner]'s sister, testified that she had a baby on November 20, 2008, and that the [Petitioner] did not visit her because he was out of town.

Lakeshia Atkins testified that she saw the [Petitioner] on November 21, 2008, in Memphis when the [Petitioner] was in town to get food stamps,

but she could not recall what time of day she saw him. She and the [Petitioner]'s brother, Robert Sutton, went to the hospital that same day to visit Latoya Winn, and Sutton was driving his mother's white Mercury Sable, despite it "running hot."

Keith Sutton, the [Petitioner]'s brother, testified that Lynette Villalpando and Patricia Jean were at his house sometime in the summer of 2009. Jean saw a picture of the [Petitioner], and she commented that he was handsome and did not state that she had identified him "as being a killer."

Lynette Villalpando testified that she was a friend of the [Petitioner]'s family and was with Patricia Jean at the [Petitioner]'s mother's house sometime in 2008 or 2009. She recalled that Jean saw a photograph of the [Petitioner] and commented that he was handsome. Villalpando found Jean's comment odd "[b]ecause here you accuse a man of murder, but you can't remember his face and what he looks like."

Dr. Jeffrey Newschatz testified as an expert in eyewitness identification concerning the issues and concerns with eyewitness identifications, including the one in this case.

*State v. Kelvin Winn*, No. W2011-02568-CCA-R3-CD, 2013 WL 1858629, at *1-7 (Tenn. Crim. App. May 2, 2013), *perm. app. denied* (Tenn. Oct. 16, 2013). The jury found the Petitioner guilty of first degree felony murder, and the trial court sentenced the Petitioner to life. *Id.* at *1, 7. On appeal, this court affirmed the Petitioner's convictions. *Id.* Our supreme court denied further review.

*Post-Conviction Proceedings*

The Petitioner filed a petition for post-conviction relief and argued that he received ineffective assistance of counsel. At the post-conviction hearing,[1] the Petitioner testified that trial counsel did not allow him to participate in creating his trial strategy and that trial counsel only visited him twice while he was incarcerated. The Petitioner noted that trial counsel did not communicate with him other than those two visits. The Petitioner stated that there were inconsistencies in the State's proof at trial; for example, Ms. Jean testified at the suppression hearing that the perpetrator's birthmark was on the left side of his face but stated at trial that it was on the right side. Additionally, the

---

[1] The record reflects that trial counsel died before the post-conviction hearing; thus, only the Petitioner testified at the hearing.

- 9 -

State's witnesses were inconsistent about whether the perpetrator was holding a gun in his right or left hand and about the perpetrator's height. The Petitioner stated that trial counsel did not point out these inconsistencies to the jury, nor did he prove the Petitioner's actual height.

The Petitioner testified that he asked trial counsel to obtain an enhanced version of the surveillance video recorded by the store that was robbed, so that the jury could better see the perpetrator. Trial counsel informed the Petitioner that he enhanced the video, but the enhanced version was not shown to the jury or admitted into evidence at trial. The Petitioner also asked trial counsel to investigate whether any blood was found on the Petitioner's clothing and whether any fingerprints were found at the scene; trial counsel did not investigate this evidence. Regarding the State's witness, Mr. Johnson, the Petitioner stated that he learned that Mr. Johnson had testified for the State in other cases. The Petitioner informed trial counsel of Mr. Johnson's prior experience as a witness for the State and asked trial counsel to speak to the prosecutor in his case. Trial counsel never told the Petitioner whether he spoke to the prosecutor about Mr. Johnson. Regarding the photographic lineup that the State showed to Ms. Jean, the Petitioner pointed out to trial counsel that his photograph was the only one where the individual had a birthmark on his face. However, the Petitioner asserted that he never looked at the photographic lineup and that trial counsel never showed the lineup to him. The Petitioner stated that, during trial, counsel would not listen to the Petitioner's suggestions, and "[i]t didn't seem like he was writing at all." The Petitioner also noted that trial counsel asked the trial court for a recess during trial to retrieve a cassette tape of a witness's testimony; however, trial counsel never retrieved the tape and never played the tape for the Petitioner. The Petitioner asserted that if trial counsel had used the information provided by the Petitioner at trial, the jury would not have convicted him of felony murder.

On cross-examination, the Petitioner stated that, if the surveillance video had been shown in full to the jury, the video would have been exculpatory evidence proving that the Petitioner did not commit the offenses at issue. The Petitioner agreed that trial counsel retained the services of Dr. Neushaff, an expert in identification, to testify at his trial. The Petitioner stated that some individuals informed him that Mr. Johnson told them that he testified against the Petitioner to try to get out of jail. He stated that he gave trial counsel the names of the individuals who heard Mr. Johnson's statement; however, trial counsel never followed up with these individuals. The Petitioner asserted that the State made a "deal" with Mr. Johnson in exchange for his testimony against the Petitioner and that the State failed to disclose this "deal." On redirect examination, the Petitioner agreed that the store's surveillance video showed that the perpetrator had a mask covering his face. The Petitioner stated that trial counsel should have argued that, if the victim's blood was not on his clothing, then the Petitioner could not have been present during the offense.

- 10 -

The post-conviction court questioned the Petitioner, who agreed that trial counsel argued to the jury that the Petitioner had an alibi defense and that trial counsel called several of the Petitioner's family members to testify. The Petitioner also agreed that trial counsel cross-examined Ms. Jean about her visit to the house of one of the Petitioner's family members, where Ms. Jean saw photographs of the Petitioner but did not recognize him. The post-conviction court noted that, at the hearing on the Petitioner's motion to suppress Ms. Jean's identification, trial counsel argued that the identification should be suppressed, but the trial court denied the motion.

Regarding the Petitioner's assertion that trial counsel should have requested that his clothing be tested for blood, the post-conviction court found that testing would not have "change[d] anything to put on proof that there [wa]s no blood on his clothes[.]" The post-conviction court also found that it was unclear how the clothes would have been analyzed and whether the trial court would have approved funding for any analysis. Regarding the Petitioner's assertion that trial counsel should have obtained an enhanced version of the surveillance video, the post-conviction court found that "there was no identification that was made based on the video. The only thing that the video showed was the mask and maybe a physical description of the [perpetrator] . . . ." The post-conviction court noted that Ms. Jean's identification of the Petitioner was the "key" to the State's case and that trial counsel thoroughly cross-examined Ms. Jean regarding her identification. The post-conviction court also found that trial counsel pointed out at trial that Mr. Johnson had served as an informant and witness for the State on a previous murder case.

The post-conviction court denied relief to the Petitioner after concluding that the Petitioner had "failed to carry his burden of proof as to the ineffective assistance of trial counsel." The post-conviction court found that trial counsel "did an outstanding job of representing the [P]etitioner[]" and "found him to be extremely well prepared both pre-trial and during trial." The post-conviction court noted that trial counsel "argued a motion to suppress the identification of the [P]etitioner in a pre-trial hearing[,]" "contested the credibility of each witness and extensively cross-examined and attacked the credibility of the state's chief identification witness[,]" and "presented a valid alibi defense." The post-conviction court also found that trial counsel put on witnesses to attack the credibility of the State's witnesses and presented an expert on identification. The Petitioner's timely appeal follows.

## II. Analysis

On appeal, the Petitioner argues that the post-conviction court erred in denying relief because trial counsel's performance was deficient for failing to: (1) obtain an

enhanced version of the surveillance video of the gas station; (2) proffer actual evidence of the Petitioner's height to the jury; (3) submit the Petitioner's clothing to be tested for blood; and (4) investigate the State's jailhouse informant for possible impeachment evidence. The Petitioner asserts that he was prejudiced by trial counsel's deficient performance because, absent these deficiencies, the jury would not have convicted him.

## Standard of Review

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id.*; *Fields*, 40 S.W.3d at 456 (citing *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457. The post-conviction court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

## Ineffective Assistance of Counsel

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S.

- 12 -

at 689; *see also Henley*, 960 S.W.2d at 579.  We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision.  *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases."  *Henley,* 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369.  In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms."  *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense.  *Goad*, 938 S.W.2d at 370.  Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

### *Failure to obtain an enhanced version of the surveillance video*

The Petitioner asserts that trial counsel's failure to obtain an enhanced version of the surveillance video and present it to the jury at trial was deficient and that he suffered prejudice as a result.  In his brief, the Petitioner argues that, on the enhanced video, the jury "would [have] be[en] able to better view the perpetrator and evaluate his height, build, and complexion."   The post-conviction court found that "there was no identification that was made based on the video.  The only thing that the video showed was the mask and maybe a physical description of the [perpetrator.]"

We conclude that the Petitioner has failed to establish that he was prejudiced by trial counsel's failure to obtain an enhanced version of the surveillance video.  The record supports the post-conviction court's finding that the surveillance video was not a salient part of the State's argument that the Petitioner was the perpetrator of the felony murder.  Because the video showed that the perpetrator was wearing dark clothing, a mask, and gloves, *Kelvin Winn*, 2013 WL 1858629, at *2, it is unlikely that enhancing the video would have enabled the jury to better evaluate the perpetrator's appearance.  Additionally, as the post-conviction court noted, the State's strongest evidence of the Petitioner's identity was Ms. Jean's identification on the photographic lineup.  Further, the Petitioner did not introduce an enhanced version of the surveillance video into

evidence at the post-conviction hearing. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). The Petitioner has failed to establish how showing an enhanced version of the video at trial would have altered the jury's verdict. Because the Petitioner has failed to establish prejudice, we will not address whether trial counsel's performance in this aspect was deficient. *See Finch*, 226 S.W.3d at 316. The Petitioner is not entitled to relief on this ground.

### *Failure to proffer the Petitioner's height to the jury*

The Petitioner asserts that trial counsel's failure to prove the Petitioner's actual height to the jury was deficient. He argues that he was prejudiced by this failure because Mr. Williams testified that the perpetrator was between 5'8" and 5'9", and if the jury had known that the Petitioner was 5'11", it would not have convicted him. The post-conviction court did not make specific findings regarding this issue, but, as noted above, the post-conviction court concluded that trial counsel's performance was not deficient and denied relief.

We conclude that the Petitioner has failed to establish that he was prejudiced by trial counsel's failure to proffer evidence of the Petitioner's actual height to the jury. As noted above, the State's strongest evidence of the Petitioner's identity was Ms. Jean's identification of the Petitioner. It is unlikely that actual evidence that the Petitioner was a few inches taller than Mr. Williams's description of the perpetrator would have altered the jury's verdict. Because the Petitioner has failed to establish prejudice, we will not address whether trial counsel's performance in this aspect was deficient. *See Finch*, 226 S.W.3d at 316. He is not entitled to relief on this ground.

### *Failure to submit the Petitioner's clothing for testing for blood*

The Petitioner additionally asserts that trial counsel's failure to submit his clothing to be tested for the presence of the victim's blood was deficient. He argues that he was prejudiced by this failure because the lack of the victim's blood on his clothing would have established that he was not present during the offense. The State argues that because the Petitioner was not identified as a suspect of interest in the case until more than seven weeks after the offense, "[i]t would have been virtually impossible to establish that any clothing offered by the [P]etitioner for analysis at that late stage was the same clothing he wore on the day of the robbery/murder." The post-conviction court found that testing would not have "change[d] anything to put on proof that there [wa]s no blood on his clothes[.]" The post-conviction court also found that it was unclear how the clothes would have been analyzed and whether the trial court would have approved funding for any analysis.

We agree with the post-conviction court that the Petitioner cannot establish that he was prejudiced by trial counsel's failure to submit the Petitioner's clothing for testing for the victim's blood. As we have noted above, the State's strongest evidence against the Petitioner was Ms. Jean's identification; analysis of the Petitioner's clothing would not have contradicted her testimony. Moreover, the Petitioner did not present at the evidentiary hearing the results of any such testing for the post-conviction court to consider. The Petitioner has failed to establish that he was prejudiced by trial counsel's failure to request testing. Because the Petitioner has failed to establish prejudice, we will not address whether trial counsel's performance in this aspect was deficient. *See Finch*, 226 S.W.3d at 316. He is not entitled to relief on this ground.

### *Failure to investigate Mr. Johnson for possible impeachment evidence*

The Petitioner asserts that the State had a "deal" with Mr. Johnson to let him out of jail if he testified against the Petitioner. The Petitioner testified at the post-conviction hearing that individuals had informed him that Mr. Johnson said that he lied during the Petitioner's trial so that he would be let out of jail. The post-conviction court found that trial counsel emphasized at trial that Mr. Johnson had served as an informant and witness for the State on a previous murder case.

We conclude that the Petitioner has failed to establish that he was prejudiced by trial counsel's failure to investigate an alleged "deal" between Mr. Johnson and the State in exchange for his testimony. The portions of the trial transcripts included in the record reflect that trial counsel cross-examined Mr. Johnson regarding his previous experience testifying for the State. The Petitioner offered no evidence to support his allegation that the State had a "deal" with the Petitioner besides his own assertion. More specifically, the Petitioner did not present the testimony of the individuals who allegedly heard Mr. Johnson's statement. Thus, the Petitioner cannot establish that he was prejudiced by trial counsel's performance in this regard. *See Black*, 794 S.W.2d at 757. Additionally, the record reflects that trial counsel filed a pretrial motion seeking disclosure of the "existence, substance, and the manner of execution or fulfillment of any promise, statement, agreement, understanding, or arrangement (between the State or its agents and any prosecution witness, cooperating individual, or such person's attorneys or representatives) given for the purpose of obtaining said person's testimony, cooperation, or disclosure of information," which the trial court granted. Because the Petitioner has failed to establish prejudice, we will not address whether trial counsel's performance in this aspect was deficient. *See Finch*, 226 S.W.3d at 316. He is not entitled to relief on this ground.

## III. Conclusion

For the aforementioned reasons, the judgment of the post-conviction court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE