FILED

09/12/2017

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 15, 2017 at Knoxville

## KWAKU ARYEL OKRAKU v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2009-A-769      Steve R. Dozier, Judge**

_____

**No. M2016-02545-CCA-R3-PC**

_____

Kwaku Aryel Okraku, the Petitioner, was convicted of two counts of aggravated child neglect and one count of reckless homicide. He received an effective sentence of sixty years. Trial counsel did not file a timely motion for new trial or notice of appeal, and after filing a petition for post-conviction relief, the Petitioner was granted a delayed direct appeal. On direct appeal, this court merged the aggravated child neglect convictions but otherwise affirmed the Petitioner's convictions. The Petitioner then renewed his petition for post-conviction relief and alleged that trial counsel's performance was deficient because he "neglected to use the strongest piece of impeachment evidence available to him—evidence that could have discredited the State's theory that the cocaine ingested by the victim belonged to [the Petitioner]." After a thorough review of the facts and applicable case law, we affirm the post-conviction court's denial of relief.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and CAMILLE R. MCMULLEN, J., joined.

Ryan C. Caldwell, Nashville, Tennessee, for the appellant, Kwaku Aryel Okraku.

Herbert H. Slatery III, Attorney General and Reporter; Andrew C. Coulam, Assistant Attorney General; Glenn Funk, District Attorney General; and Jennifer Smith and Tammy Meade, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## I. Factual and Procedural Background

*Jury Trial*

The testimony at trial established that, during the day leading up to the incident, the victim, who was three years old, was in the custody of Ms. LaTonya Majors, who did not observe the victim pick up or ingest anything unusual. *State v. Kwaku Aryel Okraku*, No. M2013-01379-CCA-R3-CD, 2014 WL 3805801, at *1 (Tenn. Crim. App. Aug. 1, 2014), *perm. app. denied* (Tenn. Dec. 19, 2014).[1]

That evening, Ms. Majors returned to her home after being unable to locate a friend to watch the victim while Ms. Majors attended her cosmetology class. *Id.* at *2. The Petitioner returned to the home "a few minutes" after she and the victim returned but quickly left and stated that he was going to his mother's residence. *Id.* The victim then began displaying unusual behavior, such as praying, stating that she saw or was talking to Jesus, and naming people she knew. *Id.* When the Petitioner returned, Ms. Majors brought the victim to him to show him her unusual behavior. *Id.* The victim collapsed while the Petitioner was holding her. *Id.* Ms. Majors estimated that "'[p]robably 20 to 30 minutes' elapsed between the time when she first observed the victim praying to the time when the victim collapsed in the [the Petitioner]'s arms[]" and that "the victim was back at home for 'about 45 minutes to an hour" before she collapsed.'" *Id.* A neighbor began performing CPR on the victim, and Ms. Majors called 9-1-1. *Id.* at *3. The paramedic who responded, Mr. Anthony Bryant, observed that the victim "was seizing and was just twitching pretty much all over . . . . [Her][e]xtremities, body, head, eyes were twitching." *Id.*

On direct appeal, this court summarized additional evidence, as follows:

> After the victim arrived at Southern Hills Hospital, doctors were able to start the victim's heart beating again. Mr. Bryant then transported the victim to Vanderbilt Children's Hospital after about "20 or 30 minutes." Mr. Bryant agreed that nothing about the victim's behavior was inconsistent with the victim's having suffered a cocaine overdose that day.

---

[1] The Petitioner and Ms. Majors were both indicted on two counts of aggravated child neglect and one count of first-degree felony murder. *Id.* The Petitioner's first trial was declared a mistrial; at the Petitioner's second trial, he was found guilty of two counts of aggravated child neglect and one count of reckless homicide. *Id.*

. . . .

Once the victim arrived at Vanderbilt Children's Hospital, doctors informed Ms. Majors that the victim was nearly unresponsive. Ms. Majors then learned on June 13, 2008, that the victim had cocaine in her system and that the cocaine was the cause of her unusual behavior. Upon learning that the victim had tested positive for cocaine, Ms. Majors "freaked out" on the [Petitioner], shouting at him and telling him that she hated him.

Ms. Majors became upset with the [Petitioner] based upon a December 2006 incident, where Ms. Majors found the victim playing with a bag in her mouth in a closet in the room that Ms. Majors shared with the [Petitioner]. The bag was small and appeared to have been torn off and tied, and Ms. Majors observed two "rocks" inside the bag that were dark yellow. Ms. Majors confronted the [Petitioner] about the bag when he returned home, and the [Petitioner] told her that the bag contained "rat poison." Ms. Majors did not believe the [Petitioner] and kept asking him about the substance in the bag, at which point the [Petitioner] told her that she "kn[e]w what it [was] and just kind of gave a smirk." Although the [Petitioner] did not specifically tell her what the substance was, Ms. Majors surmised that the bag contained rock cocaine. She believed it was cocaine partially because she knew that rat poison looked "like a green little pellet" and because the items in the bag did not match that description, nor were there rats in the residence. The [Petitioner] eventually left with the bag and told Ms. Majors that he had been holding it for a friend.

. . . .

The morning after discovering that the victim tested positive for cocaine, Ms. Majors had a conversation with the [Petitioner] at their home where they discussed how the victim could have tested positive for cocaine. The [Petitioner] told Ms. Majors that the victim possibly could have gotten the cocaine from a ball cap because the [Petitioner] had "cooked some up" in the microwave the night that the victim collapsed. He said that some of "it" may have gotten onto the cap. The [Petitioner] asked Ms. Majors if the victim had been playing with any of his hats, and Ms. Majors replied that she had, that she "always plays with all of his caps." Ms. Majors was not aware that the [Petitioner] had been cooking anything in the microwave on the night of the incident, and, although the [Petitioner] did not say what he had been cooking, it was insinuated to Ms. Majors that it was cocaine because the disclosure came during a conversation about how cocaine could

- 3 -

have entered the victim's system. That same day, Ms. Majors relayed the details of this conversation to police officers and also informed them of the December 2006 incident.

Ms. Majors described the conversation between herself and the [Petitioner] as "sarcasm, but at the same time it was [the [Petitioner]] saying that he was doing it." The [Petitioner] informed Ms. Majors that he discovered a hat with powder on it, and Ms. Majors saw the hat and observed that it had a white powder. The [Petitioner] stated that he was "back at it," meaning that he was selling drugs again. Ms. Majors agreed that she never observed any large amounts of cash or digital scales or other drug paraphernalia in the townhouse.

*Id.* at \*4-5. Dr. John Davis, a forensic pathologist and assistant medical examiner at Forensic Medical, did not perform the victim's autopsy but agreed that the victim's cause of death was related to her ingestion of cocaine. *Id.* at \*5. Dr. Donna Seger testified that "cocaine is rapidly absorbed into the body and that 'the highest level of cocaine occurs very shortly after you ingest it, certainly within an hour.'" *Id.* She also testified that "seizures occur quickly after a peak level of cocaine is reached." *Id.* Additionally,

Ms. Aniesha Ollie testified that Ms. Majors was her best friend. She shared childcare responsibilities with Ms. Majors; Ms. Majors would look after her children when Ms. Ollie could not find a babysitter, and Ms. Ollie would do the same for Ms. Majors. Ms. Ollie did not have any contact with the victim on the day that she was admitted to the hospital. She testified that she had sold marijuana but stated that she never brought drugs into Ms. Majors' residence.

*Id.* at \*6.

Robert Cross, an inmate who was incarcerated at the Criminal Justice Center with the Petitioner, testified that:

the [Petitioner] told him that the [Petitioner] had laid cocaine out on a table and that he was "bagging it up for resale." The [Petitioner] went to use the bathroom, and when the [Petitioner] returned from the bathroom, he saw the victim with white residue on her hand and told Mr. Cross that she later collapsed. The [Petitioner] also "mentioned something" to Mr. Cross about cooking something in a microwave. The [Petitioner] told Mr. Cross that the child was his girlfriend's daughter and mentioned that his girlfriend had also been charged in her murder. The [Petitioner] was afraid that his

girlfriend would later testify against him, and his plan was to place much of the blame on her if she did testify against him. . . .

*Id.*

Detective Thomas Rollins testified that the Petitioner made several jailhouse phone calls to his brothers and Ms. Ollie. *Id.* at *7. He noted that in these phone calls, the Petitioner "expressed concern that Ms. Majors was going to 'flip' and cooperate with detectives." *Id.* In one phone call, the Petitioner stated that "he did not think that Ms. Majors would tell police that he left drugs behind at the house." *Id.*

The Petitioner testified that he recalled the December 2006 incident, and he explained that Ms. Majors found mothballs. *Id.* He denied that he possessed any narcotics in the residence. *Id.* Regarding June 11, 2008, the Petitioner testified that Ms. Majors asked him to watch the victim while she attended her class. *Id.* at *8. That evening, after he returned from his mother's home, Ms. Majors brought the victim downstairs, and the Petitioner noticed the victim's unusual behavior. *Id.* When he asked Ms. Majors about the victim's behavior, she stated that the victim had been acting strangely for thirty to forty-five minutes. *Id.* "Ms. Majors went to pick the victim up, and the victim 'stumbled, hit the wall and slid down, eyes rolling in the back of her head.'" *Id.* The Petitioner also testified that:

> while at Vanderbilt Children's Hospital, he was called to a small room where Ms. Majors began shouting that she hated him. One of the doctors then explained that the victim tested positive for cocaine, and the first word out of the [Petitioner]'s mouth was "[t]he F word." He cursed because he was confused as to how a three-year-old could have cocaine in her system. The [Petitioner] was very upset when he heard this news.

> The [Petitioner] recalled that he did not argue with Ms. Majors at the townhome when discussing how cocaine could have entered the victim's system and testified that he never said anything about the victim's potentially coming into contact with a powdered substance on one of his baseball caps. He testified that he never stated that he was cooking something in the microwave on the night of the incident. He recalled that he kept his hats on the top shelf of a closet and that the victim would have been unable to reach them.

> . . .

The jury convicted the [Petitioner] of two counts of aggravated child neglect and one count of reckless homicide, and he received an effective sentence of sixty years. The [Petitioner] filed a pro se petition for post-conviction relief alleging several grounds of ineffective assistance of counsel and was permitted to file a delayed appeal because trial counsel failed to file a motion for new trial or a notice of appeal. The trial court then denied the [Petitioner]'s motion for a new trial . . . .

*Id.* at \*8-9. On appeal, this court "affirm[ed] the judgments of the trial court but remand[ed] the case for entry of a corrected judgment sheet that reflects the merger of the aggravated child neglect convictions, with aggravated child neglect through the use of a controlled substance remaining as the sole conviction for aggravated child neglect." *Id.* at \*1. Our supreme court denied further review.

*Post-Conviction Proceedings*

Thereafter, the Petitioner filed a pro se petition for post-conviction relief and argued, in part, that he received ineffective assistance of counsel. After appointment of post-conviction counsel, the Petitioner filed an amended petition and alleged, in pertinent part, that trial counsel failed to "impeach [Ms.] Majors' testimony with a letter she wrote on November 30, 2010 in which she admits to lying about Petitioner's involvement in this case."

At the post-conviction hearing, Ms. Majors testified that the Petitioner was her ex-boyfriend and that she testified at his trial. Ms. Majors testified that, prior to trial, she had been released on bond,[2] and she communicated with the Petitioner through letters and telephone calls. In a letter dated November 30, 2010, Ms. Majors stated the following to the Petitioner, in relevant part:

Over the past few weeks[,] I've been tormenting myself over this scripture which I crossed first in my sleep then again twice . . . at church and on [F]acebook. I know you've already forgiven me for this but I've never officially apologized nor asked [for] forgiveness. I'm truly sorry for lying or basically taking your words and using them for evil. I apologize for using your comment against you. I knew you weren't serious when we were arguing over where the drugs could've come from. I knew you were being sarcastic but I didn't tell them that. I only told them because I didn't

---

[2] Ms. Majors was indicted on two counts of aggravated child neglect and one count of first-degree felony murder based on the same underlying offenses as the Petitioner's charges. The results of Ms. Majors' charges are unclear in our direct appeal opinion and our record on appeal.

- 6 -

want you to get away scott [sic] free if you were responsible for [the victim's] death. Please forgive me and accept my apology. I promise I will tell them how the conversation[,] well[,] argument actually went down even if it means I have to go to jail. I can't keep living with this burden[,] it's killing me.

. . . After we found out that [the victim] had cocaine in her system[,] I didn't know what else to attribute it to but you. Then I learned that Neesha[3] was dealing with that crap and it realy [sic] didn't sit too well with me that I imediately [sic] looked at you.

Regarding this letter, Ms. Majors explained that her friend, Ms. Ollie, was selling cocaine prior to the criminal offenses. However, Ms. Majors stated that her daughter was not at Ms. Ollie's house on the day of the offenses and that Ms. Ollie did not come to her and the Petitioner's home.

When asked on cross-examination if the statements in her letter were true, Ms. Majors explained that:

Statement as far as him back at it, that was a true statement. As far as how I used [the statement], I honestly can't say -- I felt a lot of guilt after the testimony, because I didn't know for sure if he was responsible. I was going through a lot of being torn between finding out that [Ms. Ollie] had faced those same charges and the fact that he was back doing it. So I didn't know who to believe was responsible, but I do know that day my daughter was not at [Ms. Ollie]'s house, so that's why I was torn about it.

The statement of me feeling that I was using it, is because I didn't have proof he was responsible, but I was using it against him.

Ms. Majors could not recall whether trial counsel had cross-examined her regarding the contents of the letter.

Charles Okraku, the Petitioner's brother, testified that, prior to trial, he corresponded with both the Petitioner and trial counsel. He stated that the Petitioner gave him Ms. Majors' letter to give to trial counsel. When asked if trial counsel used the letter

---

[3] It appears that Ms. Majors is referring to Aniesha Ollie. However, the spelling of Ms. Ollie's first name differs between the post-conviction hearing transcript and Ms. Majors' letter. Therefore, for purposes of consistency, we will refer to her as "Ms. Ollie" throughout this opinion.

at trial, the Petitioner's brother stated that trial counsel gave a copy of the letter to the prosecutor, but the letter was not discussed at trial.

The Petitioner testified that trial counsel represented him while his case was pending in criminal court. He stated that he only spoke with trial counsel in person on one occasion for thirty to thirty-five minutes. The Petitioner said that the State did not make a plea offer to him. He stated that trial counsel did not explain what his defense strategy at trial would be and that trial counsel did not call witnesses, such as his family members and employers, to testify on his behalf. The Petitioner agreed that he received a letter from Ms. Majors prior to trial and that he gave the letter to his brother and asked his brother to give the letter to trial counsel. At trial, the Petitioner observed that trial counsel had made copies of the letter, and he explained that he believed that trial counsel was going to introduce the letter to impeach Ms. Majors' testimony. However, trial counsel did not do so. The Petitioner stated that trial counsel hired an investigator, who spoke with the Petitioner. The Petitioner testified that, if trial counsel had impeached Ms. Majors with the letter, the outcome of his trial would have been different.

On cross-examination, the Petitioner stated that trial counsel also spoke with him whenever he had a court date. He agreed that trial counsel discussed with him the testimony and evidence that was introduced at his first trial prior to his second trial. The Petitioner denied that using the letter to impeach Ms. Majors' testimony at trial could have been detrimental to his case.

Trial counsel testified that he represented the Petitioner from his arraignment on April 15, 2009, until the Petitioner's motion for new trial in May 2013. Trial counsel stated that he met with the Petitioner while he was housed in the Department of Correction, and he also spoke with the Petitioner at court appearances and occasionally on the phone. Trial counsel noted that the Petitioner's brother frequently visited trial counsel's office to discuss the Petitioner's case and would pass on information to the Petitioner. Trial counsel explained that he did not give the Petitioner his discovery to keep at the jail because of his concern about jailhouse informants. Trial counsel stated that the Petitioner's defense was that he "had nothing to do with the cocaine that his child ingested and subsequently passed away from." Regarding plea offers from the State, trial counsel stated that "there were offers in the case, but they were super ridiculous and [the Petitioner] didn't want to plead to those."

Regarding the letter that the Petitioner received from Ms. Majors, the following exchange occurred:

> [TRIAL COUNSEL]: His brother brought me the letter shortly before the second trial. The co-defendant on the case, which is the mother

of the child, who had known from before and sent a letter apparently to him talking about that she -- she basically -- if I remember, I haven't seen the letter since after the trial. So if I recall, she was basically saying that she believes it possibly wasn't him and basically changing her story a little bit about what she testified to the first time and about her opinions and she's basically all messed up, if I remember correctly, about the whole thing.

Well, long story short, the letter that I was going to use to impeach her, we talked about impeaching her if she takes the stand and testifies, I think Mr. Wing was the attorney that was representing her if I recall correctly. And so I gave a copy of the letter to [the prosecutor] and we -- on a break and we had a very spirited discussion about it and after the discussions that we had about the letter and he -- and there was -- I think there was some issues about jail calls or somethings that happened because I think [that] [the Petitioner's brother] and [the] co-defendant were talking on the phone. I realized that there might be some problems that might arise if I brought that up and used the letter. He -- [the prosecutor] at the time basically threatened that if I did use that, he was going to bring in some other evidence. So at that point, I decided not to introduce the letter.

[THE STATE]: And you did that because you felt that that could be detrimental to your client?

[TRIAL COUNSEL]: Yes, ma'am.

[THE STATE]: And that was a strategic decision that you made based on your training and experience as an attorney?

[TRIAL COUNSEL]: Yes, but when you -- when you open up one – it's basically a Pandora's box situation, you know, you get the good with the bad. The thing is that at this point after having that discussion with [the prosecutor], I felt that by opening up that box, we would have some other issues. So I remember when I cross-examined her if I recall correctly, I kind of like hinted to some of the things trying to get her to say some of the things without bringing up the letter. I can't – that's to the best of my recollection.

[THE STATE]: And did your client testify in the trial?

[TRIAL COUNSEL]: I -- yes, I believe so, in both of them.

[THE STATE]: So he was able to get his version of events to the jury and they were able to consider that?

[TRIAL COUNSEL]: Yes.

On cross-examination, trial counsel testified that, when he showed Ms. Majors' letter to the prosecutor, the prosecutor was "very upset" and threatened to "bring up some other stuff." Trial counsel explained that he had not received the "other stuff" in discovery because the prosecutor was planning on using it as rebuttal material. Trial counsel stated that he did not try to obtain the Petitioner's jail phone calls.

In its order denying post-conviction relief, the post-conviction court credited the testimony of trial counsel. The post-conviction court found that trial counsel "met with the [P]etitioner several times over a two-year period which included two trials[,]" "discussed the nature of the charges, discovery material, and trial strategy with the [P]etitioner[,]" "properly investigated the matter and even hired a private investigator to aid in his defense[,]" and "adequately cross-examined witnesses and asserted through his questions and argument that the [P]etitioner was not associated with the cocaine." Regarding the Petitioner's claim that trial counsel failed to impeach Ms. Majors with the letter, the post-conviction court found that "at the hearing Ms. Majors testified that the statement she gave to police was true, but she felt guilty and did not know for sure if [the Petitioner] was responsible." The post-conviction court also noted that trial counsel cross-examined Ms. Majors and that the Petitioner testified. The post-conviction court found that "[t]rial counsel did not attempt to introduce the letter because of the [prosecutor's] position that he would introduce jail calls if the letter was used." The post-conviction court declined to second-guess trial counsel's strategic decision and noted that "the letter also ha[d] prejudicial information that could have been used against the [Petitioner] if the letter was introduced." The post-conviction court concluded that the Petitioner had failed to establish that he was prejudiced by trial counsel's representation and denied relief. The Petitioner timely appealed.

## II. Analysis

On appeal, the Petitioner argues that he received ineffective assistance of counsel because trial counsel "neglected to use the strongest piece of impeachment evidence available to him—evidence that could have discredited the State's theory that the cocaine ingested by the victim belonged to [the Petitioner]." The State contends that Ms. Majors' letter only reveals that she did not inform the State of the Petitioner's "sarcastic tone" when he told her he had been cooking cocaine in a hat on the day of the offenses, that the pertinent content of the letter was disclosed at trial through testimony, and that "[i]n light of [the Petitioner's] admission of fault to [Ms. Majors and Mr. Cross], there was no

reasonable probability that the jury would have reached a different verdict if [trial counsel] had explicitly used the letter at trial." We agree with the State.

*Standard of Review*

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id.*; *Fields*, 40 S.W.3d at 456 (citing *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457. The post-conviction court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

*Ineffective Assistance of Counsel*

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley,* 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

At the post-conviction hearing, Ms. Majors testified that the victim was not at Ms. Ollie's residence nor was Ms. Ollie at Ms. Majors' residence during the day prior to the offenses. Ms. Majors stated that the information in her letter to the Petitioner was true and that she felt guilty for using the Petitioner's statement against him. The Petitioner testified that he gave Ms. Majors' letter to his brother, who gave it to trial counsel; the Petitioner expected trial counsel to use the letter to impeach Ms. Majors at trial. Trial counsel testified that, after he gave a copy of Ms. Majors' letter to the prosecutor, the prosecutor "basically threatened that if [trial counsel] did use [the letter], he was going to bring in some other evidence." Therefore, trial counsel decided against using the letter to impeach Ms. Majors' testimony. Trial counsel noted that he was able to bring up some of the information from the letter during his cross-examination of Ms. Majors and that the Petitioner was able to introduce his version of the events during his testimony.

The post-conviction court found that "at the hearing Ms. Majors testified that the statement she gave to police was true, but she felt guilty and did not know for sure if [the Petitioner] was responsible." The post-conviction court found that "[t]rial counsel did not attempt to introduce the letter because of the [prosecutor's] position that he would introduce jail calls if the letter was used." The post-conviction court declined to second-guess trial counsel's strategic decision and noted that "the letter also ha[d] prejudicial information that could have been used against the [Petitioner] if the letter was introduced."

Here, trial counsel would have likely been able to impeach Ms. Majors' testimony with the letter if her testimony at trial contradicted the letter. However, trial counsel, whose testimony the post-conviction court credited, testified that he made a strategic decision against introducing the letter because the prosecutor threatened to introduce more evidence against the Petitioner, likely jail phone call recordings, if the letter was admitted. Additionally, trial counsel was able to elicit much of the information in the letter that was helpful to the Petitioner from Ms. Majors' during cross-examination; "Ms. Majors described the conversation between herself and the [Petitioner] as 'sarcasm, but at the same time it was [the [Petitioner]] saying that he was doing it.'" *Kwaku Aryel Okraku*, 2014 WL 3805801, at *5 (some alterations in original). Additionally, Ms. Ollie testified at trial that "she had sold marijuana but stated that she never brought drugs into Ms. Majors' residence." *Id.* at *6. Because trial counsel decided against using the letter to impeach Ms. Majors' testimony as a part of his reasonable trial strategy, we decline to second-guess his decision. *Granderson*, 197 S.W.3d at 790; *see also State v. Kerley*, 820 S.W.2d 753, 756 (Tenn. Crim. App. 1991) ("[C]ross-examination is a strategic and tactical decision of trial counsel, which is not to be measured by hindsight."); *Taylor v. State*, 814 S.W.2d 374, 378 (Tenn. Crim. App. 1991) ("Allegations of ineffective assistance of counsel relating to matters of trial strategy or tactics do not provide a basis for post-conviction relief."). The Petitioner is not entitled to relief on this ground.

### III. Conclusion

We conclude that trial counsel's decision against using Ms. Majors' letter to impeach her testimony was a part of trial counsel's reasonable trial strategy. Trial counsel elicited information favorable to the Petitioner from Ms. Majors on cross-examination and avoided introducing information that was damaging to the Petitioner, whether in the letter or by the prosecutor's introduction of additional evidence. For the aforementioned reasons, the judgment of the post-conviction court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

- 13 -