IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 25, 2021

## ETHAN ALEXANDER SELF v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Hawkins County**
**No. 37CCI-2018-CR-13    Stacy L. Street, Judge**

———————————————————

## No. E2020-01420-CCA-R3-PC

———————————————————

Petitioner, Ethan Alexander Self, appeals the denial of his petition for post-conviction relief from his first-degree premeditated murder conviction, arguing that the post-conviction court erred in finding that he received effective assistance of counsel. Following our review of the entire record and the parties' briefs, we affirm the judgment of the post-conviction court.

## Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

JILL BARTEE AYERS, J., delivered the opinion of the court, in which NORMA MCGEE OGLE, and ROBERT H. MONTGOMERY, JR., JJ., joined.

Caleb C. McDaniel, Elizabethton, Tennessee, for the appellant, Ethan Alexander Self.

Herbert H. Slatery III, Attorney General and Reporter; and Ruth Anne Thompson, Senior Assistant Attorney General; Dennis Brooks, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

Petitioner was convicted by a Hawkins County Criminal Court jury of the first-degree premeditated murder of his father, for which he was sentenced to life imprisonment. His conviction was affirmed by this court on direct appeal, and our supreme court denied his application for permission to appeal. *State v. Ethan Alexander Self*, No. E2014-02466-CCA-R3-CD, 2016 WL 4542412, at *1 (Tenn. Crim. App., at Knoxville, Aug. 29, 2016), *perm app. denied* (Tenn. Jan. 19, 2017). At the time of the murder, Petitioner was an

eighteen-year-old high school senior and lived alone with the victim who was a sergeant with the Greeneville Police Department. *Id.* at *1, 29. Petitioner's mother was deceased. *Id.* at *2-3. After the victim failed to show for work on the evening of March 24, 2010, the victim's supervisors contacted Petitioner and went to the victim's home, where they discovered the house apparently ransacked and the victim dead in his bed from a gunshot wound to the back of his head. *Id.* at *1-4. Petitioner initially claimed innocence but eventually admitted that he shot the victim with the victim's own service revolver as the victim was sleeping. *Id.* at *9-12. Petitioner's defense strategy consisted of attempting to show that the victim had been physically and emotionally abusive to him, including on the day of the shooting, and that the shooting occurred accidentally when Petitioner was startled by the victim's sudden resumption of snoring after Petitioner went into the victim's bedroom to confront him about his abusive behavior. *Id.* This court's direct appeal opinion provides the following summary of Petitioner's second statement about the shooting:

> Agent Morton testified that the [Petitioner] stated he was going to show the victim "who the bigger man was" and that he went to the computer room to get the victim's gun. The [Petitioner] stated that he went into the victim's bedroom, that he turned on the light, that the [Petitioner] had his finger on the gun's trigger, and that the [Petitioner] had never shot the gun but thought it had a safety. The [Petitioner] stated that the victim stopped snoring, that he thought the victim was awake and aware of the [Petitioner's] presence, that the [Petitioner] was startled when the victim snored again, and that the gun went off. The [Petitioner] stated that he had intended to wake the victim and ask if the victim thought it was "cool" to yell at and beat the [Petitioner]. The [Petitioner] stated he was six to eight feet from the victim when the shot was fired. The [Petitioner] stated that when he entered the room, the victim had bedcovers over his head and faced away from the [Petitioner]. The [Petitioner] stated he panicked because he did not mean for this to happen, that he almost became sick, that he turned off the light and left the room, and that he decided to try to make it appear someone had broken into the house.

*Id.* at *12.

A number of State's witnesses testified at trial that the victim had had a loving relationship with Petitioner and that there were no signs of Petitioner's having been abused by the victim. In addition, a firearms expert testified that the victim's Glock service revolver, which was recovered from a pond into which Petitioner had thrown it, was functioning properly with all three of its internal safeties operational. *Id.* at *16. Two defense expert witnesses, however, testified that there is no external safety on a Glock, that police officers are trained to keep their fingers off the trigger until ready to fire, and that

there is a potential for accidental discharge if an untrained person handles the weapon. *Id.* at *23-24. Petitioner also presented several witnesses who described the victim as an individual with an aggressive, controlling personality and a violent temper who was abusive to Petitioner and Petitioner's mother, *id.* at *24-28, and an expert witness who opined that Petitioner had Post Traumatic Stress Disorder resulting from his childhood abuse, which had led to his "exaggerated startle response" at the victim's change in breathing. *Id.* at *22.

Petitioner filed a timely pro se petition for post-conviction relief in which he raised a claim of ineffective assistance of counsel. Among other things, Petitioner alleged that trial counsel was ineffective for failing to properly convey or appropriately act upon the State's plea offer of fifteen years for second-degree murder. Petitioner alleged that trial counsel, despite being aware of Petitioner's willingness to accept the offer, continued with the defense proof while erroneously informing Petitioner that he had until the end of the trial to accept the offer. Following the appointment of post-conviction counsel, Petitioner filed an amended petition for post-conviction relief in which he alleged that an aneurism that lead counsel experienced caused cognitive impairment that hindered lead counsel's ability to effectively communicate with or advise Petitioner.

Both lead counsel and the district attorney general who had led the prosecution were deceased by the time of the June 30, 2020, post-conviction evidentiary hearing. Petitioner testified that he and lead counsel, whom his grandmother had hired in late March or early April 2010, enjoyed a close relationship and met frequently to discuss the case. They were so close, in fact, that he stayed for approximately one week with lead counsel and his family when he first "bonded out" of jail. Petitioner stated that the trial was postponed on two or three occasions, with the last postponement caused by an aneurism that lead counsel suffered. Petitioner recalled that lead counsel spent approximately one month in a specialty hospital in Michigan. When lead counsel returned home, he called Petitioner to his office and explained that he was associating another criminal defense attorney (co-counsel) because he did not feel capable of handling the trial alone.

Petitioner testified that lead counsel had already brought in lead counsel's attorney daughter (junior counsel) to help him with the case. Junior counsel, however, was inexperienced and functioned mainly as lead counsel's assistant, performing paralegal-type duties. Lead counsel remained Petitioner's primary point of contact. Petitioner stated that lead counsel was always present when he met with co-counsel and junior counsel but that he also sometimes met alone with lead counsel. He said lead counsel directed the other attorneys and made the decisions about trial strategy.

Petitioner testified that lead counsel was mentally sharp before the aneurism but afterwards appeared to be a "watered down version" of his former self. According to

Petitioner, lead counsel often paused in the middle of conversations and exhibited memory lapses, including during the trial itself, when he on occasion had to be reminded by junior counsel of Petitioner's name. In Petitioner's opinion, during opening statements, lead counsel was "under-prepared" and "wasn't really all there," as was his cross-examination of a witness that co-counsel had originally been scheduled to question.

Petitioner testified that lead counsel first made him aware of the State's plea offer of second-degree murder to serve fifteen years on the last day of the State's case-in-chief. He said he told lead counsel that he was going to accept the plea offer but needed time to explain it to his family members who had invested a lot of time and money in the trial. He stated that he asked about the timing of his acceptance, and lead counsel assured him that he had until the very end of the trial to accept the plea offer. Specifically, lead counsel told him that he could accept the plea offer "until the last juror walks out into the jury room," meaning "at the very end of trial."

Petitioner testified that the State concluded its proof on a Thursday, and the trial court let the parties have Friday, Saturday and Sunday off before court was to resume on Monday. He said he met with lead counsel and co-counsel at co-counsel's office, where they discussed in detail the offer as well as the lesser-included offenses and sentences for the lesser-included offenses. Petitioner did not realize that the offer could be "taken off the table." He thought it "essentially was like nailed to the table for me to take, you know, whenever." When Petitioner left the office, his attorneys said they were going to make a phone call. The attorneys did not inform him of any further negotiations they had with the State.

Petitioner testified that he informed lead counsel on Monday morning before court that he was ready to accept the plea offer. According to Petitioner, lead counsel replied, "Okay, cool. We're going to go on with defense proof." When asked to explain why lead counsel had testified at a post-trial motion hearing that lead counsel had not received Petitioner's authorization to accept the State's plea offer, Petitioner speculated that lead counsel might have been "so muddled to the point that he didn't realize that I was ready to take it." Petitioner testified that he told lead counsel, not co-counsel or junior counsel, of his desire to accept the offer because his communication was always with lead counsel. He testified that he didn't feel comfortable talking about the plea offer with co-counsel, even though co-counsel had been in court with him for four days fighting for him, and he had been at co-counsel's office over the weekend. Moreover, he did not think co-counsel or junior counsel had the authority to negotiate with the prosecutors.

On cross-examination, Petitioner acknowledged that lead counsel's alleged memory lapses with respect to his name were not reflected in the trial transcript. He insisted, nonetheless, that lead counsel had memory lapses throughout the trial and had to be

- 4 -

continually assisted by junior counsel to recall information. He reiterated that he told lead counsel while they were at the courtroom defense table at the close of the State's proof that he wanted to accept the State's fifteen-year-offer but needed time to explain it to his family. He said that co-counsel was not a party to that conversation and that co-counsel and junior counsel were both otherwise occupied at that time. Petitioner additionally testified that co-counsel was not a party to the conversation he had with lead counsel the following Monday when he told lead counsel that he was ready to accept the State's offer.

Petitioner testified that he did not learn of lead counsel's and co-counsel's continued attempts to obtain a better plea offer until after the verdict was returned, and they had filed a motion to enforce the plea offer. He learned at that motion hearing that lead counsel had asked the State about those negotiations. He denied that he had any expectations that his lead counsel would be able to negotiate a better plea offer. He said he was ignorant of the trial process and thought lead counsel's continuation of the trial, despite his communication of Petitioner's willingness to accept the fifteen-year-offer, was a normal trial practice. Petitioner testified that it was during trial when lead counsel or co-counsel was told by the prosecution that the offer had been taken off the table because they did not like the defense proof. Petitioner stated that lead counsel was just as "shocked" as he was that the offer had been withdrawn.

On redirect examination, Petitioner testified that he trusted lead counsel and expected him to communicate his acceptance of the plea offer not only to his other defense counsel but also to the prosecutor at the appropriate time.

Petitioner's maternal aunt, Helen Elisabeth Amos, testified that she, her mother, and Petitioner discussed the "pros and cons" of the State's fifteen-year offer during a lunch break that took place sometime during the course of the trial. She said her understanding at the conclusion of that discussion was that Petitioner was going to accept the plea offer. On cross-examination, she recalled that Petitioner clearly stated to them that he wanted to take the plea offer. When asked if anyone tried to talk Petitioner out of accepting the plea offer, she testified that their lunchtime conversation involved a discussion of whether it would be better to accept the plea offer or continue with the trial.

Co-counsel testified that he first met with Petitioner in July 2013 after lead counsel asked him to serve as second chair in the case. It was co-counsel's understanding that lead counsel had medical conditions regarding his heart and how it affected brain bleeds. He said he had been acquainted with lead counsel since 1980, had worked with him previously, and knew him as an extraordinary attorney and communicator. Nothing stood out as different with lead counsel's performance during the pretrial preparation phase, but so-counsel noticed that lead counsel was not as fluid in his examination of witnesses at trial, at times beginning a question, pausing, and then restating the question. Despite these false

- 5 -

starts, lead counsel always managed to get his thought expressed and never "left a subject matter in the middle of a thought[.]"

Co-counsel testified that lead counsel remained lead counsel throughout the trial. He said Petitioner enjoyed a close relationship with lead counsel and that it was almost exclusively lead counsel who communicated with Petitioner about the case. He agreed that there were conversations between Petitioner and lead counsel to which he was not privy, including possibly when lead counsel and Petitioner were huddled together at the defense table. Most communications were between lead counsel, Petitioner, and Petitioner's family members.

Co-counsel testified that, based on his review of junior counsel's extensive contemporaneous notes that she recorded in a memorandum, the State's first offer of second-degree murder was conveyed to lead counsel on Tuesday, August 13, 2013, the day that the proof in the trial began. The offer did not include any set sentence or any conditions or time limitations. During lunch that day, the attorneys conveyed that offer to Petitioner but co-counsel doubted that he would have told Petitioner that there was no deadline on the offer or that the State could revoke it, as he was confident he would not have discussed accepting a plea without a specific sentence.

On Saturday, August 17, the defense team held a meeting in co-counsel's office with Petitioner, Petitioner's grandmother, and a second woman close to Petitioner, whom co-counsel referred to as Petitioner's "spiritual mother." During that meeting, they reviewed in detail the indicted charge and the lesser-included offenses and advised Petitioner of all potential outcomes and the potential sentences. It was also in that meeting that they first obtained Petitioner's permission to try to negotiate a plea offer. Co-counsel explained that when a plea offer had first been mentioned, both Petitioner's grandmother and Petitioner's spiritual mother "were very strong against any plea." He said that Petitioner was very quiet and docile and appeared to be heavily influenced by both women.

Co-counsel testified that he and lead counsel contacted the prosecutor by conference call, identified the main issues with the open-ended plea to second-degree murder, and broached the possibility of Petitioner's pleading guilty to voluntary manslaughter with a sentence outside the range. His recollection was that the conference call took place in Petitioner's presence during that Saturday meeting. He said that the prosecutor told them that he would discuss it with the victim's family and get back to them.

According to junior counsel's memorandum and co-counsel's recollection of what lead counsel told him, the prosecutor offered second-degree murder at fifteen years during a phone conversation with lead counsel the next day. Co-counsel's memory was that the offer was conveyed to Petitioner that Monday morning when Petitioner, as per his usual

custom, came early to lead counsel's hotel room to meet with lead and co-counsel as they were preparing for that day's court session. He testified that had he been asked, he would have told Petitioner that there were no time limits on the offer, but that, based on his fifty years of experience, the State could pull the offer at any time. He could not, however, recall if he specifically said this to Petitioner at the Monday morning meeting. Co-counsel acknowledged there would have been the opportunity for Petitioner to speak privately with lead counsel that morning, but he did not believe that lead counsel would have failed to inform him if Petitioner had accepted the plea offer.

Co-counsel testified that when they met Tuesday morning before trial, lead counsel attempted to persuade Petitioner to accept the plea of second-degree murder with a fifteen-year sentence. He could not recall if lead counsel informed Petitioner that the offer could be revoked at any time. What he did recall was that they agreed to meet that night to talk through all the possibilities and for Petitioner to make his decision. The Tuesday evening meeting took place in lead counsel's hotel room and, in addition to the defense team, included Petitioner, Petitioner's grandmother, and Petitioner's spiritual mother.

Co-counsel recalled having said at that Tuesday evening meeting that the plea offer could be withdrawn at any time. He added that his memory might be somewhat clouded by the fact that in his practice when discussing an offer in detail with clients, he always told his clients that an offer could be withdrawn at any time. He acknowledged there would have been an opportunity for lead counsel to convey to Petitioner in a private conversation that the plea offer would remain open until the end of the trial, but he expressed very strong doubt that lead counsel would have made such a statement. Co-counsel was adamant that he would never tell a client that a plea offer would remain open until the jury retired to deliberate a case, and he questioned whether lead counsel would "make a statement like that."

Co-counsel testified that the Tuesday evening meeting lasted an hour or more and was in the style of a "town hall" meeting, with everyone expressing his or her opinion. He distinctly recalled reviewing the indicted charge and the lesser-included offenses and being asked what he thought the jury would do. He said he replied that he did not know but that there was sufficient proof in the record for Petitioner to be convicted of first-degree murder or any of the lesser-included offenses. Lead counsel, however, was insistent that Petitioner would be convicted of at least second-degree murder, and lead counsel pushed hard for Petitioner to accept the plea offer. Petitioner's grandmother, on the other hand, was very insistent that Petitioner not accept the plea. Meanwhile, Petitioner sat on a couch in the corner without saying very much. Co-counsel stated that he told the others that they needed to allow Petitioner to make up his own mind. He said that a decision was not made that night.

Co-counsel testified that he did not talk to Petitioner on Wednesday morning before trial, but he was told that Petitioner had breakfast that morning with lead counsel at lead counsel's hotel. He said he remembered meeting lead counsel in the lobby of the hotel that morning, where lead counsel told him that Petitioner had turned down the fifteen-year offer. Sometime during the mid-morning, co-counsel approached the prosecutor to ask about the possibility of Petitioner's pleading guilty to second-degree murder with a thirteen-and-one-half-year sentence as a mitigated offender. The prosecutor told him that he would present it to the family. During the lunch break, however, lead counsel informed co-counsel that the prosecutor had withdrawn the fifteen-year offer. Co-counsel testified that he learned that the victim's family had apparently been upset by the previous day's testimony by defense witnesses of the victim's abuse of Petitioner.

On cross-examination, co-counsel testified that he never had any doubts about lead counsel's ability to effectively represent Petitioner. Co-counsel reiterated that he never heard Petitioner state that he wanted to accept the plea, and he agreed that it would be improper for an attorney to continue with a trial after a client had expressed his desire to accept a plea offer.

On September 1, 2020, the post-conviction court entered a lengthy order denying the petition for post-conviction relief. The court reviewed in detail the testimony presented not only at the post-conviction evidentiary hearing but also at the hearings on the motion for new trial and motion to enforce the Rule 11 plea offer, where lead counsel and the lead prosecutor testified about the plea negotiations. With respect to the hearing on the motion to enforce the plea agreement, the court noted that lead counsel never testified that Petitioner had accepted the plea offer. Instead, lead counsel testified that he believed that they would be in a position to accept the offer but that he had not yet received Petitioner's authorization to do so at the time the offer was withdrawn. With respect to the post-conviction evidentiary hearing, the court accredited the testimony of co-counsel over that of Petitioner, finding that there was no proof other than Petitioner's testimony of Petitioner's having informed lead counsel that he wanted to accept the fifteen-year offer and that it was "impossible to believe that such experienced attorneys would have a client inform them that they wished to accept a plea offer and then never act upon it again other than to try to get a 'better deal.'" Accordingly, the post-conviction court concluded that Petitioner failed to meet his burden of proving ineffective assistance of counsel by clear and convincing evidence.

**Analysis**

Petitioner contends that the proof at the evidentiary hearing overwhelmingly demonstrates that lead counsel was deficient in his performance for failing to properly convey, appropriately act on, or otherwise permit Petitioner to accept the plea offer and

that he was prejudiced as a result because he is now serving a life sentence for first-degree murder in lieu of a fifteen-year sentence for second-degree murder. In support, Petitioner cites his own post-conviction evidentiary hearing testimony. The State points out that the post-conviction court specifically accredited the testimony of co-counsel over that of the Petitioner and argues that the post-conviction court properly concluded that the Petitioner failed to prove his claim of ineffective assistance of counsel. We agree with the State.

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. When a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). Failure to satisfy either prong results in the denial of relief. *Strickland*, 466 U.S. at 697. Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)).

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome" of the trial. *Id.*

The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. T.C.A. § 40-30-110(f); *see Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009). The factual findings of the post-conviction court are binding on an appellate court unless the evidence in the record preponderates against those findings. *Dellinger*, 279 S.W.3d at 294. The post-conviction court's application of law to its factual findings is reviewed de novo with no presumption of correctness. *Calvert v. State*, 342 S.W.3d 477, 485. A claim of ineffective assistance of counsel presents a mixed question of law and fact that is subject to de novo review with a presumption of correctness given only to the post-conviction court's findings of fact. *Id.*

The record supports the post-conviction court's findings and conclusions. Other than the testimony of Petitioner, which the post-conviction court specifically found to be unbelievable, there is no evidence that Petitioner ever communicated to lead counsel his desire to accept the fifteen-year offer or that lead counsel failed to appropriately

communicate with or advise Petitioner with respect to the plea and plea negotiations. To the contrary, co-counsel's memory, which was corroborated by junior counsel's contemporaneous notes, was that Petitioner rejected the fifteen-year offer not only on the Tuesday morning when lead counsel strongly urged him to accept it, but also on the following morning after the Tuesday night meeting at which lead counsel again urged acceptance but Petitioner's grandmother voiced her strong opposition. Co-counsel's memory that Petitioner rejected the plea was also corroborated by lead counsel's testimony at the hearing on the motion to enforce the plea agreement, where lead counsel testified that at the time the offer was revoked, he had not yet received Petitioner's authorization to accept it. We, therefore, agree with the State that the post-conviction court properly found that the Petitioner failed to prove his allegation of ineffective assistance of counsel.

## Conclusion

For the foregoing reasons, the judgment of the post-conviction court is affirmed.

_____
JILL BARTEE AYERS, JUDGE